[No. S004354. Crim. No. 21821. Jan. 5, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD WILLIAM GARRISON, Defendant and Appellant.

[Crim. No. 26262. Jan. 5, 1989.]

In re RICHARD WILLIAM GARRISON on Habeas Corpus.

748

750

**COUNSEL**

Eric S. Multhaup, Frank O. Bell, Jr., State Public Defender, under appointments by the Supreme Court, Jean R. Sternberg, Deputy State Public Defender, and Kathy M. Chavez for Defendant and Appellant and Petitioner.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Michael D. Wellington, Herbert F. Wilkinson, Jay M. Bloom, Janelle B. Davis, David D. Salmon and Keith I. Motley, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**PANELLI, J.**—Defendant Richard William Garrison was convicted on two counts of murder in the first degree, one count of robbery, and one count of burglary. (Pen. Code, §§ 189, 211 and 459.)[1] The jury found that defendant was armed with a deadly weapon in the commission of each offense (§ 12022, subd. (a)). The jury found true four special circumstance allegations as to each murder charge: that defendant had in this proceeding been convicted of multiple murders (§ 190.2, subd. (a)(3)); that each victim was a witness to a crime and had been killed in order to prevent his (or her) testimony (§ 190.2, subd. (a)(10)); that defendant was engaged in or was an accomplice in the commission of robbery at the time of the killings (§ 190.2, subd. (a)(17)(i)); and that defendant was engaged in or was an accomplice in the commission of burglary at the time of the killings (§ 190.2, subd. (a)(17)(vii)). The judgment of death was entered under the 1978 death penalty law (§ 190.1 et seq.). The appeal is automatic (Cal. Const., art. VI, § 11; § 1239). A petition for a writ of habeas corpus was filed in conjunction

---

[1] All statutory references are to the Penal Code unless otherwise noted.

with the appeal; we issued an order to show cause thereon and, for purposes of consideration and disposition, have consolidated the two matters herein.

For reasons hereafter stated, we affirm the judgment of guilt and three of the special circumstance findings. We reverse the penalty under compulsion of *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430] and deny the petition for a writ of habeas corpus.

## I. GUILT PHASE

### A. FACTS

#### 1. *Prosecution Case.*

On the morning of November 14, 1979, Wanda Bennett's body was found partially buried under debris at the Landers dump near Yucca Valley, San Bernardino County. Officers who went to the Bennett home to report the killing found the body of Victor Bennett in his bed. He had been shot sometime during the same night.[2] The Bennetts' collections of old jewelry, coins, and guns had been taken from the home.

Police later found the Bennetts' automobile, partially obscured by bushes, by the side of a little traveled road near Yucca Valley. Mrs. Bennett's purse and identification, wrapped in a paper bag, were buried nearby. A county highway worker found two pieces of a dismantled .410-gauge shotgun along the side of another road which runs between the dump and the Bennett residence. Although it was the kind of gun that fired the types of ammunition that killed Mrs. Bennett and her husband, the absence of the bolt prevented positive identification of this gun as the murder weapon. The gun bore no fingerprints.

Two weeks later, the San Bernardino Sheriff's Department received an anonymous tip implicating defendant in the Bennett killings. Thereafter, several persons told the officers that they had seen defendant with some jewelry stolen from the Bennetts. The officers also learned that defendant and one Gary Roelle had purchased a used car, a yellow Chevy Nova. Roelle's uncle told the officers that defendant and Roelle had left for New York on November 17. Defendant had a girlfriend, Sue Harrell, in Holberton, New York; Roelle had relatives in a nearby town.

---

[2] Both victims had been killed by a single shot to the head fired at close range. Although they were killed with different types of ammunition—Mrs. Bennett was killed by a shotgun slug while Mr. Bennett was killed by No. 6 buckshot—both shots were fired from a .410-gauge shotgun.

The officers obtained warrants to arrest Roelle and defendant and went to Holberton. There they observed the Chevy Nova parked near the Harrell residence; they obtained warrants to search the premises where Roelle and defendant were staying.

On December 13 officers went to the Harrell home to serve the warrant and make the search. Two uniformed New York officers accompanied San Bernardino Detective Ross Dvorak to the door. Defendant was arrested when he greeted officers on the porch armed with a .22 pistol. The officers entered the home where the owner, Sue Harrell's father, consented to a search of the premises. Several pieces of jewelry and guns stolen from the Bennetts were recovered from the room Harrell—who was a minor—had been sharing with defendant.

A second group of officers arrested Roelle. A consensual search of the premises turned up most of the property stolen from the Bennetts as well as a jewelry box containing a key to the Bennett house.

Defendant was returned to California and charged with murder. Roelle resisted extradition but was finally returned to California on March 24, 1980, and also charged with murder. Initially he gave a statement to police in which he admitted being at the Bennett home between 8 and 9 p.m. on November 13 and admitted leaving California with defendant and in possession of stolen goods, but declined to answer any questions which would directly link him with the killings. Later Roelle agreed to tell the full story, and in a tape-recorded statement he told substantially the same story to which he later testified at trial, admitting that he had been present at the dump and residence but placing all blame for the shootings on defendant.

The prosecution's theory at trial was that defendant had planned and carried out the robbery and killing of the Bennetts, perhaps at the urging of a friend, Don Smith. The prosecution's principal witness was Roelle, who testified that defendant planned and carried out both killings. Roelle stated that he happened to be present when the crimes were perpetrated because he innocently offered to drive defendant home from Don Smith's house on the night of November 13. By the time he realized defendant's intention, he was afraid he would be killed if he were uncooperative or tried to escape.

Roelle was acquainted with Wanda Bennett because they both scavenged for old furniture and other valuables from the Landers dump.[3] Roelle

---

[3] There were evidently other connections among the parties involved in this case. Roelle had once declined Don Smith's request that Roelle steal back from the Bennetts an antique hurricane lamp which Smith believed the Bennetts had stolen from him. Don Smith was also alleged to have dealt in illegal drugs and guns and to have supplied defendant and Roelle

admitted he had seen Mrs. Bennett at the dump about 7:45 p.m. on November 13. Roelle had helped her move a rug from the dump to her home, using a truck he had borrowed for the evening from a friend. He left Mrs. Bennett about 9:15 p.m. and went to Don Smith's house where he, defendant, and Smith spent the evening taking speed. At approximately 12:40 a.m., Roelle prepared to leave. Defendant asked for a ride into town. On the way Roelle stopped at the dump to scavenge. He was surprised to see Mrs. Bennett was there. He spoke to her about some dresser drawers he had seen earlier and walked to the back of the dump to look for them.

While on the other side of the dump, Roelle heard a shot. He ran back and found Mrs. Bennett lying on the ground with defendant standing beside her body, holding a sawed-off shotgun and smiling. Roelle was stunned and frightened; he had not known defendant was armed. Defendant told him to cover the trail of blood while defendant dragged the body to the far side of the dump, and Roelle did so. Still following orders from defendant, Roelle parked the truck on a side road, got into the Bennetts' car with defendant, and rode to the Bennett house. He waited in the car while defendant used Mrs. Bennett's key to unlock the front door and enter the house. Roelle did not think he could escape because it was dark and he was not equipped to cope with the remote desert terrain. When defendant reappeared at the door and ordered him to come in and help collect the property, Roelle obeyed. Mr. Bennett had already been shot and, at defendant's direction, Roelle covered the victim's head with a pillow. He then helped defendant strip the house of jewelry, guns, and coins.

Defendant and Roelle drove to the truck, transferred the goods and, with Roelle driving the truck and defendant following in the car, proceeded to a remote area where defendant hid the car behind some bushes. Defendant then ordered Roelle to drive toward Smith's. Along the way defendant dismantled the shotgun, wiped it with a rag, and threw the pieces out the window. (Roelle identified the gun that was later recovered as defendant's weapon.) When Roelle slowed down, defendant produced a .22-caliber revolver and told him to keep driving.

When they arrived at Smith's house, defendant displayed the goods, left some of the guns with Smith, and placed the jewelry and coins in a shed on the property. Roelle saw Smith give defendant a half ounce of speed and a stereo. In response to a question from Smith, defendant stated that "they" were "both dead."

---

with amphetamines. Several of the prosecution and defense witnesses admitted to use of drugs during the period in question, and, at the time of her death, Mrs. Bennett's blood contained a significant but nonlethal amount of amphetamines.

After leaving Smith's, Roelle dropped defendant at a trailer, where defendant sometimes slept. At that time defendant was carrying a black satchel.

Roelle testified that, several days later, he and defendant split the cost of purchasing a Chevy Nova. Roelle made repairs necessary to put the car in running condition, and after loading it with their belongings—including jewelry and guns stolen from the Bennetts—the pair left for New York. Roelle explained that he resisted extradition from New York because he was afraid "the people involved in this thing" would kill him.

The facts that Roelle had admitted his and defendant's involvement in the killings prior to trial, that Roelle had ultimately agreed to testify, and that he had pled guilty to accessory and receiving charges were brought before the jury on direct examination.[4] On cross-examination defense counsel established that no promises of sentence recommendations had been made.

Defendant's involvement in the crimes was corroborated by testimony of four witnesses. Regis Reddinger testified that, early on the morning of November 15, he saw defendant carrying a black satchel containing turquoise and silver jewelry. In response to Reddinger's question about where the jewelry had come from, defendant responded that "he [Reddinger] didn't want to know" where it had come from and indicated it was "hot" in Yucca Valley.

Joe Brown reported overhearing a whispered conversation between defendant and an unknown person (not Roelle), which took place at Gary Bertheola's house one evening in late October. Brown testified that he heard defendant talking about a plan to kill the Bennetts and to hide one body in the desert so that investigating officers would mistakenly believe that one spouse had killed the other and then disappeared. Gary Bertheola confirmed that defendant and Joe Brown had been at his house together at the time this conversation was alleged to have occurred and that Roelle was not present.

Finally, John Findlay who had shared a cell in the San Bernardino County jail with defendant and six others, testified about their discussion of defendant's case and the evidence against him. Findlay claimed that, during these late-night discussions, which were frequent, defendant admitted

---

[4] In the middle of his preliminary examination, Roelle had entered a negotiated plea. In exchange for his promise to testify truthfully at defendant's trial and to not assert his privilege against self-incrimination, Roelle was permitted to plead guilty to two counts of accessory to murder and to receiving stolen property.

shooting the victims and stated that he and Roelle had purposefully lured Mrs. Bennett to the dump on the night she was killed. Findlay's testimony demonstrated that he knew of such details as the type of ammunition that had killed each of the victims.[5]

Other prosecution witnesses confirmed defendant's association with Roelle. Larry Kudabeh, a car dealer, testified that defendant accompanied Roelle when he purchased the Chevy Nova. Harold Chalmers, Roelle's uncle, testified that defendant and Roelle had left together in the Chevy on November 17 and that their car was carrying a heavy load. There was also testimony that both defendant and Roelle had on various occasions possessed sawed-off shotguns and other firearms.

### 2. The Defense Case.

The defense sought to establish an alibi and to suggest that Roelle, either acting alone or with Don Smith, had committed the homicides. The alibi consisted primarily of defendant's own testimony supported by the testimony of Laurie Brown.

Laurie Brown lived at Don Smith's house in the fall of 1979 and considered herself a good friend of defendant. She testified that she had once seen Roelle with the shotgun suspected of being the murder weapon. On the night of the killings Roelle left Smith's house between 11 p.m. and midnight, returned once at 5:30 a.m. and again at 9 a.m. Defendant meanwhile

---

[5] The defense sought to impeach Reddinger, Brown, Findlay, and Roelle with evidence of their drug use, prior criminal convictions, and their hopes for lenient treatment of currently pending charges in exchange for their testimony. Reddinger, Brown, and Roelle admitted that they had been users of amphetamines and other drugs at the relevant times. Bertheola invoked his right against self-incrimination when questioned about drug and weapons transactions.

Cross-examination also revealed that Reddinger, caught in a violation of the terms of his probation when a probation search turned up narcotics paraphernalia, had been told revocation proceedings would not be instituted if he cooperated with homicide detectives. He agreed to give a statement. Just before his testimony at defendant's preliminary hearing, Reddinger was arrested for smoking marijuana in the courthouse parking lot; Detective Dvorak intervened to ensure he was released to testify.

Joe Brown, who had two prior theft-related felony convictions, admitted that he had not offered information to officers investigating the Bennett killings until he was arrested on new charges. Brown denied that he had been promised leniency in return for his testimony either in this trial or in a separate homicide trial in Riverside County. However, he admitted that disposition of his case had been continued for a full year and that he hoped for lenient treatment at the conclusion of his testimony.

John Findlay also disclosed prior convictions and currently pending criminal charges. Although Findlay had been sentenced to concurrent jail and prison terms for two offenses prior to testifying, the sentences had not been executed at the time of defendant's trial. Less serious charges of failure to appear on traffic violations and being drunk in public were then pending and unresolved in Riverside County.

had slept on the couch at the house all night. Laurie was certain of defendant's whereabouts because she had slept nearby and had seen him when she awakened twice during the night. She claimed that it was Roelle who brought the jewelry into the house and received drugs and money from Smith. Defendant agreed simply to sell some jewelry for Roelle. Laurie also testified that Roelle, contrary to his testimony at trial, had offered to steal back for Smith a hurricane lamp which Smith believed the Bennetts had stolen from him.[6]

Defendant's testimony was generally consistent with Laurie's but differed in some details. He testified he got up several times during the night and that he was awake when Roelle returned at 5 a.m. on the morning of November 14.[7] Defendant testified that he did not hear the conversation between Roelle and Smith, but he did notice 15 to 20 guns at the house after Roelle left. Defendant admitted that he purchased a .357 revolver and a shotgun from Roelle that day. He also admitted selling some of the victim's belongings in Texas on the way to New York.

Defendant testified that, in his conversations with John Findlay, he had discussed only the evidence that would be produced against him at trial; he denied making any admissions to Findlay of his involvement in the homicides.

The prosecutor cross-examined defendant about his sale and use of amphetamines, his prior arrests and possession of firearms—including a .410-gauge and a 20-gauge shotgun—and his conflicting statements to police regarding when he first saw the jewelry, from whom he obtained it, and whether he or Roelle had primary possession. The prosecutor extensively questioned defendant as to whether he had known the Bennetts were dead when he spoke with Reddinger two days after the crimes. Defendant acknowledged he had given inconsistent answers on this point but stood by his testimony that he had not known about the killings until late in the morning of November 15 when a neighbor came to Don Smith's house with the news that Mrs. Bennett's body had been discovered at the dump.

Four defense witnesses challenged the credibility of Roelle's testimony. Defendant's former girlfriend, Sue Harrell King, and her mother, Elizabeth

---

[6] When the defense sought to question Laurie Brown, and later Don Smith, about their knowledge of and involvement in alleged drug and weapons transactions, they invoked their constitutional privilege against self-incrimination. Laurie Brown also testified that Smith had made threats against her and that she was therefore afraid to testify fully at the trial.

[7] Defendant's story was not supported by Don Smith, however, who testified that defendant and Roelle left his house together before 8 p.m. on November 13 and that defendant did not sleep there.

Harrell, relatives of Roelle who had known him for most of his life, testified that they would not believe his testimony under oath. Mrs. King testified that she had confronted Roelle about the killings and he had avoided answering, but that defendant had denied involvement. Mrs. Harrell testified that it was Roelle who brought the jewelry into her New York home.

Tom Cobb, a local burglar, testified that Roelle had asked him to stake out the Bennett house for a burglary Roelle was planning. Roelle told him that he (Roelle) would use force if necessary to complete the burglary.

Finally, the defense called Frank Pecora, who had shared a New York jail cell with Roelle. Pecora had written to the San Bernardino District Attorney to offer information about the killings. He testified that Roelle had on several occasions admitted to him that he was involved in the killings and that Roelle expressed fear that his codefendant would decide to testify against him. On cross-examination Pecora admitted that Roelle had never directly said that he personally pulled the trigger.

### 3. Verdict.

The jury was instructed on first degree murder, both premeditated and deliberate and felony murder, as well as robbery and burglary. In addition, the court instructed on accomplice liability,[8] on the enhancements for arming and personal use of firearm, and on each of the four special circumstances alleged in connection with each murder, a total of eight special circumstances. The trial court refused defendant's request for an instruction on the lesser related offense of accessory to murder.

The jury found defendant guilty of the robbery, burglary, and two counts of first degree murder. The jury found true the allegations that defendant in each of the four offenses was armed with a deadly weapon but was unable to reach verdicts on the allegations that defendant personally used a firearm in each crime.[9] The jury found true all of the special circumstances alleged in connection with each murder.

---

[8] The Attorney General argues that instructions concerning accomplice liability served only to determine Roelle's status, which was necessary for the jury to apply the rule that the testimony of an accomplice may not form the basis for conviction of a criminal offense unless the testimony is corroborated. The record, however, clearly demonstrates that the instructions pertained to defendant's potential liability as well. The jury was instructed that defendant might not be found guilty as a perpetrator if there was a reasonable doubt that he was present when the crimes were committed. This instruction was followed by one informing the jury that defendant might be found guilty as an aider and abettor whether or not he was present at the commission of the offenses.

[9] The jury reported that, as to the crimes involving Mrs. Bennett, they were split seven to five on the use allegation; as to Mr. Bennett they were split ten to two.

## B. Guilt Phase Issues[10]

### 1. Testimony of Gary Roelle.

Defendant raises three issues regarding the testimony of the main prosecution witness, Gary Roelle. He claims that the testimony should have been excluded as unduly coerced by the terms of the plea bargain, that the trial court erred in failing to instruct that Roelle was an accomplice as a matter of law, and that there was insufficient evidence to corroborate Roelle's testimony.

#### a. The Plea Bargain.

Defendant first contends that the terms of the plea bargain between Roelle and the prosecutor were so coercive that the testimony should have been excluded as unreliable. (*People* v. *Medina* (1974) 41 Cal.App.3d 438 [116 Cal.Rptr. 133]; *People* v. *Fields, supra,* 35 Cal.3d 329, 360-361.)

Prior to the completion of his preliminary examination on two charges of murder, Roelle struck a bargain with the district attorney, pleading guilty to counts of accessory to the murders of Wanda and Victor Bennett and of receiving stolen property. The written plea agreement simply states that Roelle pled because the district attorney agreed to dismiss the complaint charging Roelle with murder.

The relevant terms of Roelle's plea agreement are contained in the reporter's transcript of Roelle's preliminary hearing. The district attorney explained to the magistrate that a plea had been negotiated which "[we] believe . . . more accurately reflects his involvement in the crime to some extent." In describing the portions of the bargain which were not recorded on the written plea agreement because of possible danger to Roelle within the prison system, the district attorney gave the following summary: "There is no agreement as to what the ultimate sentence will be from the judge of the Superior Court in San Bernardino County. It is further agreed between

---

[10]Preliminarily, we summarily deal with defendant's only challenge to the composition of the jury. We have consistently held that the exclusion of jurors who would automatically vote against the death penalty does not violate a defendant's constitutional right to a trial by jury drawn from a fair cross-section of the community. (*People* v. *Fields* (1983) 35 Cal.3d 329, 374 [197 Cal.Rptr. 803, 673 P.2d 680], cert. den. (1984) 469 U.S. 892 [83 L.Ed.2d 204, 105 S.Ct. 267]; *People* v. *Miranda* (1987) 44 Cal.3d 57, 78-79 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Ainsworth* (1988) 45 Cal.3d 984 [248 Cal.Rptr. 568, 755 P.2d 1017]; see also *Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758].) We have found no reason to reexamine our holding. (See *People* v. *Warren* (1988) 45 Cal.3d 471, 479 [247 Cal.Rptr. 172, 754 P.2d 218]; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 748 [230 Cal.Rptr. 667, 726 P.2d 113].)

the D.A.'s office and Mr. Rolle [*sic*] and his attorney that as part of this agreement, part of our accepting pleas to the lesser charge here, Mr. Rolle [*sic*] will be called as a witness in the trial against William Garrison. He will agree to testify, to testify truthfully, to not exert [*sic*] his Fifth Amendment privileges. He will testify as to what happened. *As a further part of this plea agreement is that* [*sic*] *he has already truthfully stated to the investigating detectives what happened in this case.* And there have been some other requests of Mr. Rolle [*sic*] that he be given protection in the county jail and State Prison system and we have agreed to use our best efforts in accomplishing that." (Italics added.)

Roelle's counsel then added on the record, "I am advised that a polygraph was administered with respect to those statements and the result of that test, although not admissible in court except via stipulation, was that he had been truthful and I think those are matters that would be brought to the attention of the sentencing Court ultimately, anyway . . . ."

The district attorney confirmed the positive polygraph result and then voir dired Roelle. "May I ask your client specifically if he understands exactly what it is we are doing, if he understands that he is going to be called as a witness in the Garrison trial and if he understands as part of his plea bargain he is going to come in and tell the truth about what happened? . . . [¶] The Defendant: I do understand. . . . [¶] [District Attorney]: All right. That's the deal . . . ."

Defendant argues that the admission of the testimony that resulted from this plea arrangement violated due process because the terms of the bargain unequivocally required Roelle's trial testimony to conform to his pretrial statement. ■■ Defendant further contends, citing *People* v. *Ruthford* (1975) 14 Cal.3d 399 [121 Cal.Rptr. 261, 534 P.2d 1341], that the prosecution's failure to disclose the terms of the bargain prevented the defense from effectively moving to exclude or strike the testimony and precluded thorough impeachment of Roelle, also in violation of defendant's due process rights.

■ A prosecutor may grant immunity to one jointly charged with a crime upon the condition that he or she testify fully and fairly as to the facts involved. (*People* v. *Green* (1951) 102 Cal.App.2d 831, 838-839 [228 P.2d 867].) When the grant of immunity places the witness under a strong compulsion to testify in a particular fashion, however, the testimony is tainted by the witness's self-interest and is inadmissible. (*People* v. *Medina, supra,* 41 Cal.App.3d at p. 455.) The same infirmity may arise when a witness agrees to plead guilty to lesser offenses in exchange for specified testimony. (See *People* v. *Fields, supra,* 35 Cal.3d at p. 359.)

The assumption that the witness will receive the benefit of his bargain only if his testimony is beneficial or valuable to the prosecution is not alone such an inducement as to place him under the kind of compulsion condemned in *Green* and *Medina*: "What is improper . . . is not that what is expected from the informant's testimony . . . will be favorable to the People's case, but that the testimony must be confined to a predetermined formulation or rendered acceptable only if it produces a given result, that is to say, a conviction." (*People* v. *Meza* (1981) 116 Cal.App.3d 988, 994 [172 Cal.Rptr. 531].)

In *People* v. *Green, supra,* for example, an accomplice was induced to testify by the promise that he would be granted immunity from prosecution if his testimony at the preliminary hearing resulted in the defendant's being held to answer. The conviction that resulted from the accomplice's later and inconsistent trial testimony was reversed because of the use of testimony which was impure, dubious, and "tainted beyond redemption." (102 Cal.App.2d at pp. 838-839.)

In *Medina, supra,* three witnesses testified under a grant of immunity subject to the condition that they would not give testimony that materially or substantially differed from their tape-recorded statements previously given to law enforcement officers. The defendants' convictions of first degree murder were reversed upon the appellate court's finding that "[t]he error involved in the use of such tainted testimony is a denial of the fundamental right to a fair trial in violation of federal constitutional principles." (41 Cal.App.3d at p. 456.)

However, in *People* v. *Fields, supra,* 35 Cal.3d 329, this court rejected defendant's claim that critical testimony was tainted by a plea bargain that required the witness to testify in accord with her last statement to the police. The witness responded affirmatively when defense counsel asked whether she understood that the prosecutor *expected* her to testify to the same story she had given police the day before. But she also affirmed that the prosecutor had asked her to testify to the truth and had never told her to testify to a certain story.

This court found that the description of the bargain which emerged from the witness's responses to cross-examination was not inconsistent and, further, did not establish the testimony was tainted by the kind of coercion condemned in *Medina*: "The testimony is not sufficient to demonstrate either that the plea bargain required Gail Fields to testify in accord with her statement regardless of its truth, or that Gail so understood the agreement. [¶] We recognize that a witness in Gail Fields' position is under some compulsion to testify in accord with statements given to the police or the

prosecution. The district attorney in the present case obviously believed that Gail's last statement was a truthful account, and if she deviated materially from it he might take the position that she had breached the bargain, and could be prosecuted as a principal to murder. But despite this element of compulsion, it is clear . . . that an agreement which requires only that the witness testify fully and truthfully is valid, and indeed such a requirement would seem necessary to prevent the witness from sabotaging the bargain. We believe the requirements of due process, as explained in *Medina,* are met if the agreement thus permits the witness to testify freely at trial and to respond to any claim that he breached the agreement by showing that the testimony he gave was a full and truthful account." (35 Cal.3d at p. 361.)

■ Defendant asserts that the various comments by the district attorney and defense counsel concerning their basis for believing in the truthfulness of Roelle's prior statements—i.e., the positive polygraph results—are, in fact, an understanding that the plea agreement was explicitly conditioned upon the truthfulness of Roelle's pretrial statements. From this premise defendant argues that Roelle's promise to testify truthfully and the "condition" that his pretrial statements were truthful effectively combined to bind Roelle to testify at trial in accordance with the predetermined formulation contained in his prior statements to police. This, defendant argues, rendered the testimony irredeemably tainted and its admission a violation of appellant's rights to due process of law.

We cannot accept defendant's premise that Roelle's bargain was "conditioned" upon the truth of his prior statements. When we consider the context of the comments made by the district attorney and by Roelle's counsel and the absence of any request that Roelle confirm the accuracy of those assertions, we do not find that the plea agreement was based upon such a "condition" as defendant describes. Rather, as in the *Fields* case (*supra,* 35 Cal.3d 329), the record does not demonstrate either that the plea bargain required Roelle to testify in accord with his statement regardless of its truth, or that Roelle so understood the agreement. Rather the record reflects that the district attorney and Roelle's counsel sought to ensure that the record reflected the factual basis for their belief that permitting Roelle to plead guilty to the lesser charges would be appropriate in light of their understanding of his actual involvement in the offenses.

It was Roelle's counsel who was most anxious to have the record reflect the fact that a polygraph indicated Roelle's statements were truthful, to ensure that that fact would be brought to the attention of the court which eventually sentenced his client. Although the district attorney did initially state that the truthfulness of the statements was "part of this plea agreement," it was not among the "terms" of the deal he outlined when question-

ing Roelle on his understanding of the plea agreement. Nor did the judge mention the alleged "condition" in his voir dire of Roelle.

Roelle was never told that he had to testify to the same story he had already told police and he never agreed to so testify. Nor was he told that the deal would be off if his trial testimony differed from the prior story. It is apparent that the district attorney *expected* Roelle to testify to the same story at trial. It is a rare case indeed in which the prosecutor does not discuss the witness's testimony with him beforehand and is assured that it is the truth. However, unless the bargain is expressly contingent on the witness sticking to a particular version, the principles of *Medina, supra,* 41 Cal.3d 438, and *Green, supra,* 102 Cal.App.3d 831, are not violated.

In light of our conclusion that the plea bargain was not conditioned on the truthfulness of prior statements, we also reject defendant's contention that failure to disclose this "term" of the plea bargain constituted a denial of due process under *People* v. *Ruthford, supra,* 14 Cal.3d 399, and prevented defense counsel from successfully moving to exclude Roelle's testimony pursuant to *Medina, supra,* 41 Cal.App.3d 438. In *Ruthford,* both the critical witness and the prosecutor told the court that no promise of leniency had been made to the witness. However, defendant later discovered that the district attorney's office had promised that the witness's *wife* would receive favorable consideration in her own sentencing hearing in exchange for the witness's testimony against the defendant. These facts led the court to conclude that Ruthford had been denied due process by the suppression of substantial material evidence bearing on the credibility of a key prosecution witness.

In contrast, in defendant's case the fact that Roelle was permitted to plead to a relatively minor offense after he agreed to testify *was* disclosed at trial. Roelle made no false or misleading statement about his treatment. The transcripts of certain pretrial proceedings indicate that defendant's counsel was well aware that Roelle had pleaded guilty to reduced charges in exchange for his agreement to testify against defendant. The record also establishes that the defense was aware of the basic outline of Roelle's plea agreement. Whether that knowledge included the prosecutor's professed belief in the truth of Roelle's pretrial statements or the fact that Roelle had performed favorably on the polygraph examination is not indicated in the record. However, in view of our conclusion that the prosecutor's statement is merely a profession of *his* belief of Roelle's story, rather than a term of the plea bargain, any failure to disclose does not violate *Ruthford, supra,* 14 Cal.3d 399. And, finally, defendant's counsel's lack of detailed information about Roelle's plea did not hinder a motion to exclude his testimony, since it was not inadmissible under *Medina, supra,* 41 Cal.3d 438, in any event.

### b. *Instruction on Accomplice Status.*

■ Defendant argues that the court erred in failing to instruct the jury that Roelle was an accomplice as a matter of law.

Section 1111 defines an accomplice as a person "who is liable to prosecution for the identical offense charged against the defendant on trial." ■ Whether a person is an accomplice is a question of fact for the jury unless there is no dispute as to either the facts or the inferences to be drawn therefrom. (*People* v. *Rodriguez, supra,* 42 Cal.3d 730, 758-759; *People* v. *Tewksbury* (1976) 15 Cal.3d 953, 960 [127 Cal.Rptr. 135, 544 P.2d 1335].) ■ The fact that a witness has been held to answer for the same crimes as the defendant and then granted immunity does not necessarily establish that he or she is an accomplice. (*Tewsksbury, supra,* 15 Cal.3d at p. 960.)

■ Defendant argues that Roelle's testimony plainly demonstrated his role in setting up the crimes he described—his testimony established that Roelle lured Mrs. Bennett to the dump and assisted with the burglary of the Bennett home. According to defendant, the trial court should not, therefore, have permitted the jury to determine as a matter of fact whether or not Roelle was an accomplice, but should have instructed the jury as a matter of law that Roelle was an accomplice whose testimony must be viewed with suspicion.

An examination of Roelle's testimony, however, shows that he denied luring Mrs. Bennett to the scene and that he consistently denied harboring the intent to facilitate the crimes, which is an essential element of accomplice liability. (See *People* v. *Tewksbury, supra,* 15 Cal.3d at 960; *People* v. *Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318].) Roelle claimed he did not know defendant was armed and that he was surprised by the killing of Mrs. Bennett and everything that followed. Although Roelle admitted activities that aided the burglary, he testified that he performed them because he feared for his life. The truthfulness of Roelle's account of the events of November 13 and the existence of facts which were material to a determination of Roelle's status as an accomplice were central factual issues at trial. The trial court could not have instructed that Roelle was an accomplice as a matter of law without offering to the jury the court's belief that the witness had given false testimony. Accordingly the question was a factual one properly submitted to the jury.

### c. *Corroboration—Sufficiency of Evidence.*

■ Defendant argues that the evidence of corroboration was legally insufficient to connect him with the commission of the offenses. He claims

that no physical evidence or direct testimony, other than Roelle's, confirmed that defendant participated in either killing. On the contrary, we find that, assuming the jury found Roelle to be an accomplice, there was sufficient, competent evidence to corroborate his testimony.

The Penal Code provides that a conviction "cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense . . . ." (§ 1111; *People* v. *Wallin* (1948) 32 Cal.2d 803, 808 [197 P.2d 734].)

■ "The evidence required for corroboration of an accomplice 'need not corroborate the accomplice as to every fact to which he testifies but is sufficient if it does not require interpretation and direction from the testimony of the accomplice yet tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth; it must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged.' [Citations.] Moreover, evidence of corroboration is sufficient if it connects defendant with the crime, although such evidence 'is slight and entitled, when standing by itself, to but little consideration.' [Citations.]" (*People* v. *Hathcock* (1973) 8 Cal.3d 599, 617 [105 Cal.Rptr. 540, 504 P.2d 476]; see also *People* v. *Perry* (1972) 7 Cal.3d 756, 769 [103 Cal.Rptr. 161, 499 P.2d 129].)

■ Corroborating evidence may be circumstantial in nature, and may consist of evidence of the defendant's conduct or his declarations. (*People* v. *Mardian* (1975) 47 Cal.App.3d 16, 43 [121 Cal.Rptr. 269].) ■ The prosecutor presented evidence of defendant's conduct and declarations that tended to connect defendant to the commission of the killings. Reddinger testified that he saw defendant less than 24 hours after the murders in possession of property stolen from the victims, with the knowledge that the property was stolen, and possibly that the owners had been killed. Moreover, defendant was in possession of some of this property when arrested.

■ Further, evidence of flight supports an inference of consciousness of guilt and constitutes an implied admission which may properly be considered as corroborative of an accomplice's testimony. (*People* v. *Perry, supra,* 7 Cal.3d at p. 771.) ■ Defendant admitted leaving California with Roelle less than four days after the homicides by which time defendant undisputably knew that he and Roelle possessed items stolen from the murdered victims. The jury could reasonably have inferred that defendant's flight demonstrated consciousness of guilt.

Finally, two witnesses testified to extrajudicial statements made by defendant which tended to connect him with the offenses. Joe Brown overheard appellant planning a double murder and concealment of one of the bodies. ██ ██ ██ ██ ██ ██ John Findlay testified that appellant admitted involvement in the murders.[11]

██ An appellate court must view the evidence in a light most favorable to the verdict and must uphold the trial court's disposition if, on the basis of the evidence presented, the jury's determination is reasonable. (*People* v. *Perry, supra,* 7 Cal.3d at p. 774.) ██ Application of these principles to the evidence in this case requires that we reject defendant's contention regarding the sufficiency of evidence of corroboration.

2. *Cross-examination of Joe Brown.*

██ ██ Defendant argues that the trial court improperly curtailed cross-examination of Joe Brown in sustaining objections to two questions. We conclude that the court did not err.

██ First, the trial court did not permit defense counsel to elicit the specific offense for which Brown was in custody when he gave information to the police. Counsel had established that Brown was confined in jail at the time of his statement and that the charge against him had not been disposed of at the time of trial. The exact nature of the charge was not material to his bias.

██ Second, Brown was asked whether his counsel had told him that the district attorney had made specific offers of lenience in return for his trial testimony. The trial court advised Brown that conversations with his attorney were privileged and sustained an objection to another similar question on the ground that it assumed facts not in evidence. The record indicates no error. Defense counsel established that trial on the charge against Brown was delayed by Brown's counsel and that Brown *hoped* to obtain lenience in return for his testimony, although he did not know whether he could *expect* it. Defense counsel made no attempt to establish that promises had in fact been made to Brown, either by questioning investigating officers or by securing admissions from the prosecutor. (Cf. *United States* v. *Gerard*

---

[11] Defendant argues that the testimony of informers who hoped to receive lenient treatment in exchange for testimony should be treated with the same caution as testimony of accomplices. This argument was rejected in *People* v. *Alcala* (1984) 36 Cal.3d 604 [205 Cal.Rptr. 775, 685 P.2d 1126] where this court explained that a jailhouse informant does not share the accomplice's "overwhelming motive to shift blame to defendant." Thus, where the jury was fully apprised of the possible selfish motives of the informant, we declined to interfere with the jury's determination of the witness's credibility. (*Id.* at p. 624; see also *People* v. *Hovey* (1988) 44 Cal.3d 543, 565-566 [244 Cal.Rptr. 121, 749 P.2d 776].)

(9th Cir. 1974) 491 F.2d 1300, 1303-1304, where counsel was prevented from questioning a witness about his knowledge of a promise the prosecutor admitted he had made.)

 Neither ruling improperly restricted the cross-examination of Brown. Sufficient facts suggesting Brown's bias were disclosed so the jury could adequately weigh his credibility. (*People* v. *Ruthford, supra,* 14 Cal.3d 399.)

### 3. *Instructional Error.*

 Defendant assigns a number of instruction errors which, he claims, require reversal of the judgment of conviction. Specifically, defendant asserts the trial court erred by: (1) failing to instruct, sua sponte, that defense witness Don Smith might be regarded as an accomplice; (2) giving an accomplice-liability instruction disapproved by this court in *People* v. *Beeman, supra,* 35 Cal.3d 547; (3) refusing to instruct on the lesser related offense of accessory to murder (see *People* v. *Geiger* (1984) 35 Cal.3d 510 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055]); (4) instructing that the jury might find appellant guilty of burglary felony murder if it found he entered the Bennett home with the intent to commit the felony of murder (*People* v. *Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323]); and (5) instructing the jury not to speculate regarding the prosecution of persons other than defendant (CALJIC No. 2.11.5). We conclude hereafter that if in fact the court erred in instructing the jury in the above-stated matters, any such error was harmless.

### a. *Don Smith as Accomplice.*

 The trial court did not err in failing to instruct sua sponte that defense witness Don Smith might be regarded as an accomplice. A trial court is not ordinarily under a duty to instruct on accomplice testimony where the witness testifies on behalf of the defense. (*People* v. *Cortez* (1981) 115 Cal.App.3d 395, 406 [171 Cal.Rptr. 418]; *People* v. *Graham* (1978) 83 Cal.App.3d 736, 743 [149 Cal.Rptr. 6].) The fact that the defense witness in this case gave self-interested testimony unfavorable to the defense does not alter the rationale for this rule. The rule is otherwise for a prosecution witness since it is the accomplice's motive to testify falsely in return for leniency that underlies the close scrutiny given accomplice testimony offered against a defendant. (*People* v. *Graham, supra,* 83 Cal.App.3d at p. 743.) A defendant is powerless to offer this inducement.

### b. *Beeman Error.*

 The prosecutor theorized that defendant was the perpetrator or a conspirator in the planning and commission of the offenses. The defense

was alibi. ■ ■■ ■■ ■ ■ Nevertheless, the court instructed the jury on aiding and abetting, and, based on the jury's inability to agree on whether defendant personally used a weapon, it is conceivable that the jury relied on principles of accomplice liability in reaching its verdicts as to defendant.[12] We therefore examine the instructions on aiding and abetting.

■ In *People* v. *Beeman, supra,* 35 Cal.3d 547, we held that conviction as an aider and abettor requires proof that a defendant acted with knowledge of the perpetrator's criminal purpose and with an intent to commit or facilitate the commission of the underlying felony and that CALJIC Nos. 3.00 and 3.01 as they then read were inadequate for failure to apprise the jury of the intent requirement. (*Id.* at pp. 560-561; see also *People* v. *Croy* (1985) 41 Cal.3d 1, 11-12 [221 Cal.Rptr. 592, 710 P.2d 392].) The Attorney General concedes *Beeman* error.

■ In *People* v. *Dyer* (1988) 45 Cal.3d 26, 59-65 [246 Cal.Rptr. 209, 753 P.2d 1] we determined that henceforth the proper test of prejudice applicable to *Beeman* error is that enunciated in *Chapman* (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065])—whether we can determine beyond a reasonable doubt that the error did not affect the verdict. ■ Applying that test, we conclude that the record demonstrates beyond a reasonable doubt that the *Beeman* error could not have affected the verdicts convicting defendant of first degree murder.

In addition to the testimony of Roelle, who accompanied defendant on the night of the killings and who testified in detail to the events of the night in question, prosecution evidence showed that prior to the killings defendant was heard discussing the robbery and murder of the Bennetts and

---

[12] Defendant takes various and inconsistent positions on the propriety of giving the aiding and abetting instructions. In supplemental briefing, he asserts that the instructions should have been limited to the jury's evaluation of Roelle's accomplice status and that they are inapplicable to the determination of his own criminal liability. As noted earlier (*ante,* p. 766, fn. 8), defendant's potential liability as an accomplice was before the jury despite the prosecution's concerted attempt to prove him the actual killer.

Defendant also asserts, however, that he did not receive constitutionally adequate notice of his potential liability as an aider and abettor. On the contrary, as to each of the felony-murder special circumstances, the information advised defendant that the victim was killed during the commission or attempted commission *or while defendant was acting as an accomplice in the commission or attempted commission of either robbery or burglary.*

Additionally, in California the definition of a principal has historically included those who aid and abet (§ 971), and notice as a principal is sufficient to support a conviction as an aider or abettor. As stated in *People* v. *Greenberg* (1980) 111 Cal.App.3d 181, 188 [168 Cal.Rptr. 416], ". . . one may be convicted of aiding and abetting without the accusatory pleading reciting the aiding and abetting theory so long as defendant is charged in that pleading as a principal to the substantive offense and thus receives notice of the charge against him. (Pen. Code, §§ 971, 952; *People* v. *Kennedy* (1953) 116 Cal.App.2d 273, 274-275 [253 P.2d 522].)"

describing the manner in which the crimes were to be carried out. While awaiting trial, defendant confided to a cellmate that he shot the Bennetts and made it appear that Wanda had killed Victor and then run away. At the very least, in finding defendant guilty on the robbery and burglary counts on an accomplice theory, the jury necessarily would have found that he *aided* the perpetrator with the requisite *knowledge* of the perpetrator's purpose. The defense was alibi and, inasmuch as the alibi was rejected by the jury, we must assume that the jury found beyond a reasonable doubt that defendant and Roelle were together during the course of the offenses. No evidence was presented or argument made that defendant was present at the scene of the crimes merely as a bystander, and absent evidence that defendant only accidentally or unintentionally aided the commission of the robbery and burglary, we may conclude that no reasonable trier of fact could have found that defendant aided the perpetrator with the requisite knowledge and at the same time have concluded that the defendant did not act for the purpose of facilitating or encouraging the burglary and robbery. (See *Croy, supra,* 41 Cal.3d at p. 14.) Since on this record there is no possibility that the jury could have found that defendant "aided" the commission of the robbery and burglary other than intentionally, the convictions of first degree murder can be upheld under the felony-murder rule. In sum, the *Beeman* error was harmless beyond a reasonable doubt.[13]

■ Defendant's supplemental brief raises a separate argument challenging the aiding and abetting instruction on the ground that it created an unconstitutional mandatory presumption of an element of the crime charged. Defendant asserts that a part of the instruction, read in isolation, permits conviction on the ultimate offense without a finding by the jury of any intent to facilitate or encourage that offense. We conclude that the jury did not reach its verdict based on any unconstitutional presumptions.

The instruction complained of (CALJIC No. 3.00) read in pertinent part: "One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable or probable consequence of any act that he knowingly aided or encouraged." Defendant reasons that the instruction requires a showing of criminal knowledge only as to the underlying threshold offense, and mandatorily "presumes" the mens rea necessary to establish guilt of the naturally or probably resulting offense.[14]

---

[13]The same result is compelled under the less stringent test of harmless error under the California Constitution. (See *People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1228, fn. 27 [249 Cal.Rptr. 71, 756 P.2d 795].)

[14]To the extent that the contention is an attack on the felony-murder rule itself, defendant cannot prevail. We note that, as a separate issue, he urges us to reject the felony-murder rule

Defendant asserts that the instruction is deficient because it permits a conviction without a finding that he "in fact intended to kill, rob or burgle, or even knew that these were the crimes contemplated by Gary Roelle." Defendant fails to recognize the nature of an accomplice's liability. The mens rea of an accomplice is "not designed to ensure that his conduct constitutes the offense with which he is charged. His liability is vicarious. Like the conspirator whose liability is predicated on acts other than and short of those constituting the elements of the charged offense, if the acts are undertaken with the intent that the actual perpetrator's purpose be facilitated thereby, he is a principal and liable for the commission of the offense. . . . (*People v. Beeman, supra,* 35 Cal.3d 547, 560.)" (*People v. Croy, supra,* 41 Cal.3d at p. 12, fn. 5.) "It is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense, which *Beeman* holds must be found by the jury." (*Ibid.*)

### c. *Burglary Felony-murder Instruction.*

 The court instructed the jury that "Every person who enters any structure of the type shown by the evidence in this case with the specific intent to steal, take and carry away the personal property of another . . . *or with the specific intent to commit murder,* a felony, is guilty of the crime of burglary." (CALJIC No. 14.50 (1979), italics added.) While this is a proper statement of the mental element of burglary, an entry with the specific intent to commit murder cannot support a felony-murder conviction under the doctrine of merger explained in *People v. Ireland, supra,* 70 Cal.2d 522 and *People v. Wilson* (1969) 1 Cal.3d 431 [82 Cal.Rptr. 494, 462 P.2d 22]. The instruction given in defendant's case required a finding of intent to commit larceny *or* an intent to kill. But if the jury relied on entry with intent to kill as the basis for its burglary verdict, the burglary could not provide a basis for application of the felony-murder rule, for the burglary was an integral part of and included in fact within the homicide.

 Despite the instruction, however, we are not compelled to reverse the conviction of first degree murder, since the conviction can be upheld on the alternative basis of felony murder premised on the robbery of the Bennetts. The court instructed the jury on first degree felony murder based on either robbery or burglary, and the evidence would support a finding of robbery as to each of the murder victims. The prosecution argued that the killings, the robbery, and the burglary were a continuous course of

because it creates an unconstitutional presumption of malice. We settled that issue in *People v. Dillon* (1983) 34 Cal.3d 441, 472-476 [194 Cal.Rptr. 390, 668 P.2d 697].

conduct—that Mrs. Bennett was killed to obtain her car and the keys to her house, which were used to enter the home for the purpose of killing Victor in order to steal the couple's valuables. Thus, the jury could find a robbery of Mrs. Bennett that continued at least until her car was disposed of and perhaps until the perpetrator reached the Smith residence, a point of safety.

Additional support for our conclusion that the burglary felony-murder instructional error was harmless is found in the true finding of the robbery-murder special circumstance. The information charged that Mr. Bennett was killed while defendant was engaged as perpetrator or accomplice in the commission of a robbery. Since the jury necessarily found the killing in the course of a robbery, the burglary instruction, as given, is of no consequence. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913].)

### d. *Lesser Related Offense.*

■■■ The trial court refused defendant's request that the jury be instructed on accessory to murder, a lesser offense related to the charged offenses.

After defendant's trial, in *People* v. *Geiger, supra,* 35 Cal.3d 510 this court determined that due process requires a trial court to grant a defense request for such instruction when certain prerequisites are met. However, we expressly stated that the new rule be given only prospective application: "Because the purpose of instructing on related offenses is primarily prophylactic . . . it shall . . . apply only to cases in which a trial or retrial commenced after this decision becomes final." (*Id.* at p. 532, fn. 13.) Thus, even assuming arguendo that defendant's request fell within the purview of *Geiger,* no reversible error occurred in refusing to give the instruction on the lesser related offense of accessory to murder.

We reject defendant's argument that *Griffith* v. *Kentucky* (1987) 479 U.S. 314 [93 L.Ed.2d 649, 107 S.Ct. 708] requires retroactive application of *Geiger. Griffith* holds that new rules of criminal procedure *required by the federal Constitution* should be applied retroactively to all cases pending on direct review. ■■ ■■ While the federal Constitution, on due process grounds, requires instruction on lesser *included* offenses in capital cases (*Beck* v. *Alabama* (1980) 447 U.S. 625, 638-643 [65 L.Ed.2d 392, 403-406, 100 S.Ct. 2382]), no similar requirement exists for instruction on lesser *related* offenses.

### e. *CALJIC No. 2.11.5.*

■■■ The jury was instructed: "There has been evidence in this case indicating that a person other than defendant was or may have been

involved in a crime for which the defendant is on trial. You must not discuss or give any consideration as to why the other person is not being prosecuted in this trial or whether he has been or will be prosecuted." (CALJIC No. 2.11.5) The use note cautions that "this instruction is not to be used if the other person is a witness for either the prosecution or the defense."

Defendant argues that the instruction precluded the jury from considering Roelle's plea bargain in determining whether he had a bias or motive for testifying as he did, and that, in thus shielding Roelle's bias from jury scrutiny, the instruction encroached on defendant's constitutional rights to confront witnesses, to due process, and to a fair trial. We disagree. Any deficiency in giving CALJIC No. 2.11.5 was cured by other instructions and, inasmuch as Roelle's testimony was corroborated by other evidence, the same result would have been reached in the absence of this error. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

■ In determining whether an instruction interferes with the jury's consideration of evidence presented at trial, we must determine "what a reasonable juror could have understood the charge as meaning." (*California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 940, 107 S.Ct. 837, 839].) While the initial focus is on the specific instruction challenged (*Francis* v. *Franklin* (1985) 471 U.S. 307, 315 [85 L.Ed.2d 344, 354, 105 S.Ct. 1965]), we must also review the instructions as a whole to see if the entire charge delivered a correct interpretation of law. (See *People* v. *Williams* (1988) 45 Cal.3d 1268, 1312-1313 [248 Cal.Rptr. 834, 756 P.2d 221].)

■ While CALJIC No. 2.11.5, standing alone, might have precluded the jury from considering Roelle's plea bargain, the court also instructed the jury not to single out any instruction and ignore the other instructions (CALJIC No. 1.01) and that they were the sole judges of a witness's credibility and should consider "the existence or nonexistence of a bias, interest, or other motive" (CALJIC No. 2.20). Moreover, Roelle's testimony was corroborated with other evidence (see *ante,* 772-774). In sum, we conclude that defendant suffered no prejudice within the meaning of *Watson* (46 Cal.2d at p. 836).

4. *Reporting of Instructions.*

■ We reject defendant's contention that the failure to report the reading of the instructions denied him due process. The parties stipulated that the court reporter might be excused from reporting the reading of the jury instructions. In light of counsel's stipulation and defendant's failure to

suggest that there was any deviation in the reading from the typed copies contained in the record, we find no violation of due process.

### 5. *Sufficiency of Evidence.*

 In support of his claim that the convictions are not supported by substantial evidence, defendant relies on *People* v. *Jenkins* (1979) 91 Cal.App.3d 579 [154 Cal.Rptr. 309] which is not apposite. In *Jenkins,* defendant's denials and evasions regarding the physical evidence provided the *only* evidence of his knowledge and intent with respect to the charged offenses. Here, in contrast, the testimony of Roelle and the corroboration provided by other witness and circumstantial evidence is affirmative and sufficient to support defendant's convictions.

### 6. *Inconsistent Verdict.*

 Defendant contends that the jury's failure to reach a verdict on the allegations that he personally used a firearm demonstrates that the verdicts finding him guilty of murder were based solely on the theory that he aided and abetted Roelle in the commission of the crime. Finding him an accomplice, he claims, contradicts the prosecutor's evidence and theory of the case and runs afoul of the principles of equitable estoppel set forth in *People* v. *Taylor* (1974) 12 Cal.3d 686 [117 Cal.Rptr. 70, 527 P.2d 622]. The contention is without merit.

 Although the prosecutor argued that defendant was the triggerman and that Roelle's involvement was limited to the role described in his testimony. there was other evidence from which the trier of fact could reasonably have inferred that defendant and Roelle were jointly involved in the commission of the offenses.

For its part, the court was under a duty to instruct on the general principles of law relevant to the issues raised by the evidence (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 323 [185 Cal.Rptr. 436, 650 P.2d 311]), and the court correctly determined that the evidence warranted instruction on the law pertaining to felony murder and accomplice liability, in addition to instruction on the prosecutor's theory of deliberate and premeditated murder.

Defendant's reliance on the principles of collateral estoppel and *People* v. *Taylor, supra,* 12 Cal.3d 686 is misplaced. Taylor, Smith, and Daniels planned a robbery with Taylor to remain in the getaway car. Smith was killed by the shopkeeper. Daniels was acquitted of Smith's murder; we reversed Taylor's subsequent conviction for murder on the basis of collater-

al estoppel, expressly limiting our holding "to the particular circumstances of the instant case where an accused's guilt must be predicated on his vicarious liability for the acts of a previously [acquitted] confederate." (12 Cal.3d at p. 698.)

In *People* v. *Howard* (1988) 44 Cal.3d 375 [243 Cal.Rptr. 842, 749 P.2d 279], we reiterated the limited applicability of the *Taylor* decision and noted that the "general rule is that acquittal of one codefendant normally will not require acquittal of another." (44 Cal.3d at p. 412.)

In the instant case, no jury had aquitted Roelle of responsibility in the killing of the Bennetts and, as noted earlier, it may be inferred that the jury determined that both Roelle and defendant were jointly involved in the criminal activity but could not decide beyond a reasonable doubt which one had pulled the trigger.

### 7. *Rereading of Testimony.*

Defendant contends that he was denied his constitutional right to be present at trial (Cal. Const., art. I, § 15) and denied the right to counsel when the court responded to two requests from the jury, one for a replay of Roelle's taped statements and another, for a rereading of the testimony of Frank Pecora.

#### a. *Right to Presence.*

At his own request, defendant had personally waived his right to be present at any such proceedings so that he could be housed at the county jail rather than at the courthouse during deliberations. A defendant in a felony case is required to be present "at the arraignment, at the time of plea, during the preliminary hearing, during those portions of the trial when evidence is taken before the trier of fact, and at the time of the imposition of sentence. The accused shall be personally present at all other proceedings unless he shall, with leave of court, execute in open court, a written waiver of his right to be personally present, approved by his counsel, . . ." (§ 977.) Although defendant's oral waiver does not comply with the writing requirement of the section, we find no reversible error. Defendant's absence, even without waiver, may be declared nonprejudicial in situations where his presence does not bear a "reasonably substantial relation to the fullness of his opportunity to defend against the charge." (*People* v. *Bloyd* (1987) 43 Cal.3d 333, 359-360 [233 Cal.Rptr. 368, 729 P.2d 802]; *People* v. *Jackson* (1980) 28 Cal.3d 264 [168 Cal.Rptr. 603, 618 P.2d 149]; see also *People* v. *Odle* (1988) 45 Cal.3d 386, 406-407 [247 Cal.Rptr. 137, 754 P.2d 184].)

The burden is on defendant to demonstrate that his absence prejudiced his case or denied him a fair trial. (*People* v. *Bloyd, supra,* 43 Cal.3d at p. 360.) Absent assertion of any theory of prejudice and in view of the clear, albeit oral, waiver, we find no basis for reversal.

b. *Denial of Counsel.*

Although the jury's first request to hear Roelle's tape-recorded pretrial statements was granted after consultation with the prosecutor and defense counsel, the court was unable to locate defense counsel when faced with the request for the rereading of Pecora's testimony. In *People* v. *Hogan* (1982) 31 Cal.3d 815 [183 Cal.Rptr. 817, 647 P.2d 93], we stated the long-standing rule that communications from the jury should be entertained in open court, with notification of counsel. " 'It is obviously critically important that a defendant and his attorney be permitted to participate in decisions as to what testimony is to be reread to the jury; the essence of the error in this action is its tendency to deprive the defendant of his fundamental constitutional right to the assistance of counsel at this critical stage of the proceedings.' " (31 Cal.3d at p. 849.) We further held that if counsel's absence may have affected substantial rights of a defendant, prejudice is presumed and only the most compelling showing to the contrary will overcome the presumption.

The testimony at issue was that of Frank Pecora, a defense witness who had been in jail with Roelle in New York. The Pecora testimony was that Roelle had confessed to shooting the Bennetts and had not implicated defendant. It defies imagination to believe that any defense counsel would have disapproved of the jury rehearing the testimony of this very favorable witness. The trial court was undoubtedly aware of this when it granted the jury's request for the reread. Under the strictest test of prejudice, any error in rereading the Pecora testimony in the absence of counsel is harmless beyond a reasonable doubt. (*Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711].)

8. *Effective Assistance of Counsel.*

Defendant faults counsel in two respects, for failing to move to suppress evidence found in the New York residences of defendant and Roelle (§ 1538.5) and for failing to move for a new trial on the ground that the verdict was against the weight of the evidence (§ 1181, subd. 6). Appellate courts reverse convictions on the ground of inadequate assistance of counsel only when the record affirmatively reveals that counsel had no rational tactical purpose for an allegedly incompetent act or omission. (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 581 [189 Cal.Rptr. 855, 659

P.2d 1144].) A reviewing court will not second-guess trial counsel's reasonable tactical decisions. (*People* v. *Pope* (1979) 23 Cal.3d 412, 424 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

### a. *Suppression of Evidence.*

 The legality of the search of the Harrell residence, where defendant was staying at the time of his arrest, was raised at his preliminary hearing. New York and California officers had arrived at the residence with arrest and search warrants. The search warrant was not used, however, because Mr. Harrell gave consent for search of the room his minor daughter was sharing with defendant. From the record, it appears that Susan, the daughter, gave her consent as well.

The magistrate denied the motion to suppress, finding that Susan's consent was validly given. Counsel renewed his motion at trial after Detective Dvorak had testified to the circumstances of the arrest and search. The court acknowledged the prosecutor's objection that the suppression motion was untimely (§ 1538.5, subd. (n)), but because of the gravity of the charges, refused to deny it. On defense counsel's representation that he was attempting to secure the testimony of a witness (presumably Susan), the court admitted the evidence found in the room subject to a defense motion to strike after testimony from the witness. The motion to strike was never made.

Our review of the record, including the transcript of the preliminary hearing, supports the finding of a consensual search. Defendant makes no allegation that Susan Harrell could have testified to facts contrary to those shown by Detective Dvorak's testimony, and it is a reasonable inference that counsel made a deliberate decision not to pursue the suppression motion because her testimony would not support the motion. We conclude that defendant's ineffective assistance claim is meritless.[15]

### b. *Motion for New Trial.*

 Defendant contends that counsel rendered constitutionally ineffective assistance under *People* v. *Pope, supra,* 23 Cal.3d 412 and *People* v. *Fosselman, supra,* 33 Cal.3d 572 because he failed to move for a new trial on the grounds that the verdicts were against the evidence (§ 1181, subd. 6).[16] He urges that certain remarks made by the court after the verdicts

---

[15] Trial counsel cannot be faulted for failing to move for suppression of items taken from the New York residence of Roelle or items belonging to the Bennetts found at a New York jewelry store. Those items also were obtained with consent of the individuals concerned.

[16] Counsel did move for a new trial after the verdicts on a different ground—to pursue potentially exculpatory evidence from a witness. He believed one Elaine Bayard would testify

indicate that the court would probably have granted a properly submitted motion pursuant to its power to consider the weight of the evidence. (*People v. Borchers* (1958) 50 Cal.2d 321, 328 [325 P.2d 97].)[17]

Based on the trial court's comments at that time and later, we are persuaded that counsel did not render ineffective assistance of counsel for failure to make a motion for new trial on the grounds asserted. The record makes clear that, despite the court's skepticism of Roelle's testimony, it was convinced that the evidence was sufficient to sustain defendant's convictions and that the evidence was "more than adequate" to prove defendant's participation in the murders.[18]

9. *Petition for Habeas Corpus.*

■■■ Defendant's petition for habeas corpus raises additional issues relative to the effectiveness of counsel. We issued an order to show cause limited to the following: "1) whether or not the alcohol dependency of defendant's court-appointed counsel, Blendon Beardsley, deprived defendant of due process or effective assistance of counsel; and 2) whether Beardsley's failure to undertake essential research and investigation denied defendant effective assistance of counsel."

---

that she had been at the dump and had seen Roelle shoot Mrs. Bennett. Although the court permitted the defense to rest conditionally and the pronouncement of judgment was delayed three months from the time the jury returned its verdicts, counsel was not successful in his attempts to locate or interview this witness. The motion was eventually denied.

[17] The comments relied on were made after the death verdict, during proceedings pursuant to section 190.4, subdivision (e). The court stated: "Let me assure you this. *I do not for one minute believe the testimony of Mr. Roelle in his version of what happened.* That does not mean that I don't believe that you were involved either equally with or certainly could have been in excess in the responsibility of Mr. Roelle, but the story of Mr. Roelle, as far as I'm concerned, as to how the killing occurred, is inherently improbable, if not impossible. That does not, however, change the verdict nor the sufficiency of the evidence for the verdict to have been rendered." (Italics added.)

[18] Prior to pronouncement of judgment the court stated: "In this case I will frankly say, . . . you would get better odds in Las Vegas on the roulette table than I would give you as to the total truthfulness of Mr. Roelle's testimony, and if I had any way of substantiating my personal evaluation of Mr. Roelle's testimony, if there were facts to substantiate that he was lying, and there is not—my observation is merely my own conjecture—I would not allow the conviction to stand. Mr. Garrison would have a new trial.

"But there is no evidence to support a contention that Mr. Roelle lied, whatever his motivation may have been for testifying, and the ultimate conclusion that I come to is that the evidence is more than adequate to convince me that Mr. Garrison's participation in the murders, notwithstanding what Mr. Roelle may have done or may not have done, and at this juncture I consider my function to be one to determine whether the evidence, and I have so determined in the past, is sufficient under the law to allow the verdict to stand and the penalty imposed by the jury. . . . If I had any doubt as to the full adequacy of the evidence that was introduced in this trial to convict Mr. Garrison or that there were any errors of law committed which were of a nature warranting a new trial, that would certainly happen. I have not found that. I do not find it now. . . ."

Responding to the first issue, defendant contends that he was denied effective assistance because Beardsley's performance was per se deficient due to his alcoholism. As to the second issue, defendant claims Beardsley's performance was deficient because he called only one witness at the penalty phase and failed to contact other individuals who could have testified. Inasmuch as we hereafter reverse the penalty judgment on other grounds, we will not reach the second issue.

■■■ The claim of ineffective assistance of counsel involves two components, a showing the counsel's performance was deficient and proof of actual prejudice. (*Strickland* v. *Washington* (1984) 466 U.S. 668 [80 L.Ed.2d 674, 104 S.Ct. 2052]; *People* v. *Ledesma* (1987) 43 Cal.3d 171 [233 Cal.Rptr. 404, 729 P.2d 839].)

■■■ Although it is uncontested that Beardsley was an alcoholic at the time of trial and that he has since died of the disease, defendant has failed to prove that Beardsley's performance was deficient. His reliance on a per se rule of deficiency for alcoholic attorneys is contrary to settled law. We hereafter conclude, therefore, that defendant was not denied his right to effective assistance of counsel.

Blendon Beardsley was court-appointed counsel for defendant from February of 1980 until judgment of death was entered in January of 1981. It is undisputed that Beardsley was an alcoholic at the time of his representation and that he consumed large amounts of alcohol each day of the trial. The declarations in the petition and traverse indicate that Beardsley drank in the morning, during court recesses, and throughout the evening. Although these declarations confirm that Beardsley was an alcoholic, they do not address whether Beardsley's addiction adversely affected his courtroom performance to such an extent that defendant was denied effective assistance of counsel.

Statements made by the bailiff and the trial judge provide insight into the quality of Beardsley's representation. The bailiff, Hector Delgadillo, declares that he was in close contact with Beardsley throughout the trial, that Beardsley always smelled of alcohol, but that Delgadillo "could never really tell for sure to what extent Mr. Beardsley was under the influence of alcohol because he always seemed to act the same," and that he did not see Beardsley stagger or sleep in court.

The trial judge was in the best position to evaluate Beardsley's condition and performance. The judge was put on notice of Beardsley's alcohol problem when, on the second day of jury selection, Beardsley was arrested for driving to the courthouse with a .27 percent blood-alcohol content. On the

following day, the judge made a detailed inquiry of the matter and repeatedly asked defendant if he wanted the court to appoint new counsel. Defendant insisted that he wished to continue with Beardsley. The judge stated that Beardsley's courtroom behavior had not given him any reason to believe that Beardsley should not continue and told defendant, "I personally can assure you that you probably have one of the finest defense counsel in this county."

The judge was apparently satisfied with Beardsley's competence and allowed him to continue. In fact, at the conclusion of the penalty phase the judge praised Beardsley for his effort, stating to defendant: "Let me tell you this. I'm not going to try to convince you that the representation that you had in this case was carried on with as much vigor and dedication as any trial I have witnessed because being in your position at this point you certainly are not ready to accept that, and I'm not going to spend a lot of time telling you that. [¶] Mr. Beardsley, as I expressed to you earlier in these proceedings, has been one of the better defense attorneys in this county and certainly the amount of effort that he expended in your case is commendable, although the results in your position are not."

In support of his petition for habeas corpus, defendant submits the declaration of Dr. H. Westley Clark. Dr. Clark declares that a chronic alcoholic loses the ability to think through new problems or tasks and often cannot make judgment calls. Defendant concludes from Dr. Clark's analysis that attorneys who are chronic alcoholics should be held ineffective as a matter of law.

Defendant's position cannot be sustained, however, because it would render irrelevant Beardsley's actual performance in court. Our review of the facts indicate that Beardsley did a fine job in this case. Indeed, defendant concedes that Beardsley outwardly appeared competent, but argues that inwardly Beardsley was "a shell of a man." That may be true, but there is no authority for the type of per se rule espoused by defendant. He must still prove specific deficiency.

We find one authority which addresses this novel issue, *Fowler* v. *Parratt* (8th Cir. 1982) 682 F.2d 746. There the court rejected defendant's claim that a rebuttable presumption of ineffectiveness should apply where counsel was an alcoholic. The court concluded that defendant failed to show that counsel's drinking problem resulted in prejudice. (*Id.* at p. 750.)

■ Prejudice is presumed, however, where counsel's performance was so deficient that a breakdown in the adversarial process occurred. (*United States* v. *Cronic* (1984) 466 U.S. 648, 656-659 [80 L.Ed.2d 657, 666-668,

104 S.Ct. 2039].) "When a true adversarial criminal trial has been conducted—even if defense counsel may have made demonstrable errors—the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated." (*Cronic, supra,* at pp. 656-657 [80 L.Ed.2d at pp. 666-667], fns. omitted.) The case before us is not such a case.

At present, a presumption exists in *favor* of the effectiveness of counsel. A defendant has the burden of showing by a preponderance of the evidence that counsel's representation was deficient. (*Cronic, supra,* 466 U.S. at p. 658 [80 L.Ed.2d at p. 667]; see also *Ledesma, supra,* 43 Cal.3d at p. 216.) ▮ A per se rule would create a presumption against the competence of attorneys with drinking problems and would invite defendants to challenge their convictions on the basis of speculation about the drinking habits of their attorneys, rather than on the basis of the attorney's actual performance in court.

Furthermore, any bright-line definition of alcoholism itself would be arbitrary and impractical to administer. We therefore decline to adopt a per se rule of deficiency on the mere showing of alcohol abuse.

▮ Alternatively, defendant makes several specific allegations of deficiency of performance during the guilt phase, i.e., that Beardsley "(1) failed to move for a new trial on the statutory ground of false and incredible prosecution testimony, (2) failed to research the law and obtain an adjudication regarding the arrest and search of Garrison in New York, (3) failed to require the court reporter to take down the jury instructions, and (4) failed to maintain contact with the court throughout jury deliberations." These issues have been raised and rejected in the appeal. Defendant presents no additional factual basis or legal authority to warrant reconsideration.

## II. Special Circumstances

Defendant challenges all eight special circumstances. As to some he assigns instructional errors; as to others he asserts a failure of proof. For reasons stated hereafter, we vacate five and uphold three of the special circumstance findings.

▮ Preliminarily, we note that, although not separately raised as a ground for striking the burglary-murder special circumstances, we are nevertheless compelled to strike those two special circumstances for failure to instruct on the *Ireland* (*supra,* 70 Cal.2d 522) exception to the burglary felony-murder rule—that the felony-murder rule can only apply if the jury finds that defendant entered for the purpose of theft. We concluded earlier

(see *ante,* 778-779) that the burglary could not serve as the basis for the first degree felony-murder verdict. The same deficiencies are inherent in the findings on the burglary felony-murder special circumstances. We therefore vacate the burglary felony-murder special circumstances and address the defendant's challenges to the remaining six.

## A. *Felony-murder and Multiple-murder Special Circumstances and Intent to Kill.*

 Defendant contends that the felony-murder and multiple-murder special circumstances must be vacated for failure to instruct on intent to kill. (*Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862]; *People* v. *Turner* (1984) 37 Cal.3d 302 [208 Cal.Rptr. 196, 690 P.2d 669].) The court instructed in the language of former CALJIC No. 8.18.17 that for a true finding of the burglary-murder and robbery-murder special circumstances, the jury must find "that the murder was committed while the defendant was engaged in or was an accomplice in the commission or attempted commission of [robbery or burglary]."

 In *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], we overruled *Carlos* and held that intent to kill is not an element of the felony-murder special circumstance; but when the defendant is an aider and abettor rather than the actual killer, intent to kill must be proved before the trier of fact can find the special circumstance to be true. (43 Cal.3d at pp. 1138-1139.) ██ Where, as here, there was evidence from which a jury could have based its verdict on an accomplice theory, the court erred in failing to instruct that the jury must find that defendant intended to aid another in the killing of a human being.[19] The instructional error does not necessarily compel reversal, however. As we recently made clear, instructional error affecting special circumstance findings is subject to *Chapman* harmless error analysis. (*People* v. *Odle, supra,* 45 Cal.3d 386, 410-415.)

In making our analysis, we examine the other instructions to determine if the factual question not posed to the jury by the failure to instruct on intent

---

[19] Later—too late—*at the penalty phase of the trial,* the court paraphrased the language of section 190.2, subdivision (b): "It is also the law of this state that the penalty for a defendant found guilty of murder in the first degree who did not commit the act or acts causing the death but who intentionally aided, abetted, . . . in the commission of a murder in the first degree, shall suffer death or life without possibility of parole in any case in which one or more of the special circumstances charged in this case have been found to be true." While the court's instruction at the penalty phase correctly stated the circumstances under which an accomplice can become death qualified, by then the jury had already determined that defendant was death eligible. We therefore reject the Attorney General's suggestion that the quoted instruction served to cure the absence of proper instruction at the guilt phase.

was necessarily resolved adversely to defendant under other, properly given instructions. (See *People* v. *Sedeno, supra,* 10 Cal.3d 703). ▮▮▮ We conclude that in relevant aspects the present situation does fall with the *Sedeno* prescription.

The trial court instructed that, for a true finding on the witness-killing special circumstance, it must be proved, inter alia, "that the witness was intentionally killed for the purpose of preventing his testimony in a criminal proceeding." Here, when the jury found the witness-killing special circumstance to be true, it impliedly found an intentional killing. Although we later find, on grounds not relevant to this discussion, that the instruction on witness killing was deficient, that instruction nonetheless correctly posed the intent-to-kill issue for the jury, and the jury's finding on that special circumstance necessarily included a determination that the Bennetts were intentionally killed. It is true, as defendant points out, that the finding of an intentional killing does not completely resolve the question, for the jury could have found the allegations true on a determination that someone other than defendant was the actual killer of the Bennetts.

However, to reach a true finding on the witness-killing special circumstance, the jury necessarily found either that defendant alone committed the intentional murder or that he aided and abetted the actual perpetrator of the intentional murder. For the purpose of our analysis we must assume the latter. As a result, as with the felony-murder verdicts (*ante,* pp. 775-778), we are again faced with the inadequacy of the aiding and abetting instruction (*People* v. *Beeman, supra,* 35 Cal.3d 547), and we again apply the *Chapman* test to determine the prejudicial effect of the *Beeman* error. (*People* v. *Dyer, supra,* 45 Cal.3d 26.)

In convicting the defendant as an accomplice to an intentional killing, the jury must necessarily have found that he committed the "aiding" act and that he did so with knowledge of the perpetrator's criminal purpose, i.e., to kill for the purpose of preventing the victim's testimony. Because of the manner in which defendant defended the case—denial that he in any way aided in the killing—there is no way for the jury to find that he "aided" the killing only "accidentally" or "unintentionally." (See *People* v. *Beeman, supra,* 35 Cal.3d at p. 560.)

We conclude, therefore, that any inadequacy in the aiding and abetting instruction could not have affected the finding on the witness-killing special circumstance. We further conclude that the failure to properly instruct under *Carlos/Anderson* on the felony-murder special circumstances is cured by the jury's findings of the intent requirement in the witness-killing special circumstances. (*People* v. *Sedeno, supra,* 10 Cal.3d 703.) And finally, for the

same reasons that we uphold the validity of the felony-murder special circumstances, we find the *Carlos/Beeman* contentions unmeritorious as they relate to the multiple-murder special circumstances. (See *People* v. *Turner, supra,* 37 Cal.3d 302.)

B. *Felony-murder Special Circumstances and Independent Felonious Purpose.*

 Defendant contends that there is insufficient evidence to establish that the killings occurred "during the commission" of robbery or burglary and that the failure of proof was compounded by the court's failure to instruct on the principles of *People* v. *Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468], and *People* v. *Thompson* (1980) 27 Cal.3d 303 [165 Cal.Rptr. 289, 611 P.2d 883]. *Green* and *Thompson* stand for the proposition that a murder is not committed during a felony for purposes of the special circumstance unless it is committed to carry out or advance the commission of the felony. In other words, as applied here, the jury could not find true the robbery or burglary special cirumstances if the robbery or burglary was "merely incidental to the commission of the murder." (*Green,* 27 Cal.3d at p. 61.)

 However, the trial court is not required to sua sponte instruct in all cases on the principles of *Green* and *Thompson* without regard to whether the evidence supports such an instruction. (*People* v. *Kimble* (1988) 44 Cal.3d 480 [244 Cal.Rptr. 148, 749 P.2d 803].) When the evidence raises no issue with respect to the special circumstance law and the trial court has correctly and adequately explained the general principle of law requiring a determination whether the murder was committed "during the commission" of a felony, it is the defendant's obligation to request any clarifying or amplifying instruction on the subject. (*Kimble,* 44 Cal.3d at p. 503.)

 We turn to the question of whether the murders were committed "during the commission" of a felony. The record in *Green* established that the defendant's primary goal was not to steal but to kill (27 Cal.3d at p. 62), and in *Thompson* there was a serious question whether the perpetrator had any intent to steal at all (27 Cal.3d at p. 323). In contrast, the record here establishes that the robbery was not merely incidental to the killings but was instead the primary purpose of the enterprise.

Defendant notes that Roelle was silent as to the motivation for the killings, for the taking of the keys from Wanda, and for the looting of the Bennett residence. From that premise, he reasons that there is not substantial evidence that theft, rather than the killing, was the primary objective. Defendant's argument ignores the testimony of other witnesses, which we

need not repeat here. Suffice it to say that, after reviewing the whole record in the light most favorable to the judgment below (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]), we find substantial evidence to support the felony-murder special-circumstance findings.

### C. *Witness-killing Special Circumstances.*

■■■ Defendant's claim that the witness-killing special circumstances were improperly charged and submitted to the jury and that the evidence is insufficient to support the resulting findings has merit and requires that we vacate the findings in these special circumstances.

Section 190.2, subdivision (a)(10) permits a finding of special circumstance where "The victim was a witness to a crime who was intentionally killed for the purpose of preventing his testimony in any criminal proceeding, and the killing was not committed during the commission, or attempted commission of the crime to which he was a witness; . . ." The statutory language contemplates the following elements: (1) a victim who has witnessed a crime prior to, and separate from, the killing; (2) the killing was intentional; and (3) the purpose of the killing was to prevent the victim from testifying about the crime he or she had witnessed. (See *People* v. *Weidert* (1985) 39 Cal.3d 836 [218 Cal.Rptr. 57, 705 P.2d 380]; *People* v. *Silva* (1988) 45 Cal.3d 604 [247 Cal.Rptr. 573, 754 P.2d 1070].)

The prosecutor's attempt to apply this special circumstance to the facts of this case clearly contravened the language and intent of the statute. He argued: "Wanda was killed to prevent her from being a witness to the burglary of her home. Okay. Victor was killed to keep him from being a witness to the robbery of Wanda. . . ." Neither victim, however, had in fact witnessed any crime other than the crime currently in progress at the time the victim was killed. According to the evidence, Wanda was killed at the dump some distance from her home before either the burglary of the home or the killing of Victor occurred. Though this killing may have been planned and intended to prevent Wanda from *becoming* a witness to the other crimes, such a killing does not fall within the statutory language.

Victor was not a witness to any crime committed against Wanda. It is not disputed that he was at home, in or near his bed, when he was shot, and there is no evidence that he observed the arrival of defendant and Roelle in Wanda's car.

### D. *Multiple-murder Special Circumstances.*

■■■ Defendant claims that the trial court erred when it permitted two separate multiple-murder special circumstances to go to the jury. We agree.

Duplicate use of the multiple-murder special circumstance was proscribed in *People* v. *Harris* (1984) 36 Cal.3d 36 [201 Cal.Rptr. 782, 679 P.2d 433], which cautioned that "alleging two special circumstances for a double murder improperly inflates the risk that the jury will arbitrarily impose the death penalty." It is suggested in *Harris* that appropriate charging papers should allege one "multiple murder" special circumstance separate from the murder counts. (36 Cal.3d at p. 67.) In the words of the statute (§ 190.2, subd. (a)(3)), the information would read: "The defendant has in this proceeding been convicted of more than one offense of murder in the first or second degree." Accordingly, we vacate one of the multiple-murder special circumstances. (See *People* v. *Odle, supra,* 45 Cal.3d at pp. 409-410.)

### E. *Multiple Use of Same Felony.*

Defendant contends that use of the same burglary or robbery as the basis for the felony-murder rule *and* as a special circumstance is an impermissible dual use of the felonies and an overbroad sentencing mechanism. The argument was addressed and rejected in *People* v. *Balderas* (1985) 41 Cal.3d 144, 200-201 [222 Cal.Rptr. 184, 711 P.2d 480]. (See also *People* v. *Gates* (1987) 43 Cal.3d 1168 [240 Cal.Rptr. 666, 743 P.2d 301]; *Lowenfield* v. *Phelps* (1988) 484 U.S. 231 [98 L.Ed.2d 568, 108 S.Ct. 546].)

### F. *Felony-murder Special Circumstances—Single Course of Conduct.*

Defendant also assigns error in the charging of both robbery and burglary as special circumstances when the felonies occurred during a single course of conduct undertaken to further one principal criminal objective. The contention was rejected in *People* v. *Harris, supra,* 36 Cal.3d 36, 60-61. *Harris* upheld the procedure to allow the prosecutor to charge any special circumstance supported by the evidence.

### G. *Corroboration of Accomplice Testimony.*

Defendant asserts that a special circumstance may not be proved by uncorroborated accomplice testimony and the trial court must so instruct.

Section 190.4, subdivision (a), provides in pertinent part: "Wherever a special circumstance requires proof of the commission or attempted commission of a crime, such crime shall be charged and proved pursuant to the general law applying to the trial and conviction of the crime." As we have demonstrated (*ante,* at p. 772), the trial court correctly instructed on Roelle's accomplice status and the requirement of corroboration. We also found legally sufficient evidence of corroboration (*ante,* at pp. 772-774). The

conclusions apply equally to the findings of special circumstance. (See *People* v. *Belmontes* (1988) 45 Cal.3d 744 [248 Cal.Rptr. 126, 755 P.2d 310]; *People* v. *Adcox* (1988) 47 Cal.3d 207 [253 Cal.Rptr. 55, 763 P.2d 906].)

### III. PENALTY PHASE—RAMOS ERROR

 Defendant persuasively contends that the court committed reversible error under *People* v. *Ramos, supra,* 37 Cal.3d 136. In accordance with the so-called Briggs Instruction, the court delivered the following unqualified charge: "You are instructed that under the state Constitution, a governor is empowered to grant a reprieve, pardon or commutation after sentence following conviction of a crime. Under this power a governor may in the future commute or modify a sentence of life imprisonment without possibility of parole to a lesser sentence that would include the possibility of parole." (CALJIC No. 8.84.2 (1979).)

In *People* v. *Ramos, supra,* 37 Cal.3d at page 153, we held that "the Briggs Instruction is incompatible with [the] guarantee of 'fundamental fairness' [established in the due process clauses of our Constitution (Cal. Const., art. I, §§ 7, 15)] both because it is seriously and prejudicially misleading and because it invites the jury to be influenced by speculative and improper considerations."

*Ramos* error is generally reversible. (*People* v. *Ramos, supra,* 37 Cal.3d at p. 154; *People* v. *Montiel* (1985) 39 Cal.3d 910, 928 [218 Cal.Rptr. 572, 705 P.2d 1248].) Thus, when the court has instructed the jury with the unadorned Briggs Instruction and fails to ameliorate the potential for prejudice, we have reversed the penalty judgment. (*People* v. *Ramos* (1982) 30 Cal.3d 553 [180 Cal.Rptr. 266, 639 P.2d 908]; *People* v. *Anderson, supra,* 43 Cal.3d 1104, 1151; *People* v. *Warren, supra,* 45 Cal.3d 471, 489; *People* v. *Myers* (1987) 43 Cal.3d 250, 270-273 [233 Cal.Rptr. 264, 729 P.2d 698]; *People* v. *Montiel, supra,* 39 Cal.3d 910, 928; *People* v. *Ramos, supra,* 37 Cal.3d at p. 154; *People* v. *Haskett* (1982) 30 Cal.3d 841, 861-863 [180 Cal.Rptr. 640, 640 P.2d 776]; *People* v. *Bunyard, supra,* 45 Cal.3d 1189, 1242-1244. Cf. *People* v. *Hamilton* (1988) 45 Cal.3d 351, 375-376 [247 Cal.Rptr. 31, 753 P.2d 1109]; *People* v. *Coleman* (1988) 46 Cal.3d 749 [251 Cal.Rptr. 83, 759 P.2d 1260]; *People* v. *Griffin* (1988) 46 Cal.3d 1011 [251 Cal.Rptr. 643, 761 P.2d 103].)

In the instant case, the court did not elaborate on the Governor's commutation power, and the prosecutor did not refer to the instruction in his argument to the jury. We therefore conclude that the error in instructing the jury with the Briggs Instruction requires us to reverse the penalty judgment.

The Attorney General once again asks that we reconsider the *Ramos* holding, making the same argument we considered and rejected in that case. We have recently declined to do so in *People* v. *Bunyard, supra,* 45 Cal.3d 1189, 1243; accord *People* v. *Griffin, supra,* 46 Cal.3d 1011.

## IV. Conclusion

The judgment of guilt, the finding of one multiple-murder special circumstance, and the findings of felony-murder (robbery) special circumstances are affirmed. The second multiple-murder special circumstance, the witness-killing special circumstances, and the felony-murder (burglary) special circumstances are set aside. The judgment of death is reversed. We discharge the order to show cause and deny the petition for habeas corpus.

Lucas, C. J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

**BROUSSARD, J.**—I concur in the affirmance of the judgment as to guilt and the finding of one multiple-murder special circumstance. I concur in the setting aside of the second multiple-murder special circumstance, the witness-killing special circumstance, and the felony-murder (burglary) special circumstances. I concur also in reversing the death judgment. I dissent, however, from the affirmance of the felony-murder (robbery) special circumstances.

In *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], we held that when the defendant is an aider and abettor rather than the actual killer, the defendant's intent to kill must be proved before a felony-murder special circumstance can be found true. (43 Cal.3d at p. 1139.) Since in this case the jury could have found defendant an accomplice in the felony murder, rather than the actual killer, the majority concede that it was error to fail to instruct the jury that defendant's intent to kill must be proved before it could find the felony-murder special circumstances true. The majority find, however, that because the jury made a true finding as to the witness-killing special circumstance, which requires a finding of intent to kill, the jury found that the victims were intentionally killed. The majority acknowledge that the jury could have found the witness-killing allegation true on the theory that defendant aided and abetted an intentional killing; nonetheless the majority conclude that even under the faulty aiding and abetting instructions given, the witness-killing finding established that the jury found that defendant intended to kill.

I part company with the majority in analyzing the effect of the faulty aiding and abetting instruction on the elements necessarily established by the finding of the witness-killing special circumstance.

In *People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318], we held that a defendant's liability as an aider and abettor required proof that he intended to commit or facilitate the commission of the offense. (*Id*. at pp. 560-561.) We said that the standard jury instructions on aiding and abetting, given also in this case, were inadequate. They required proof that defendant did an act which aided the perpetrator, with knowledge of the perpetrator's purpose, but did not require that defendant intend to commit or facilitate commission of the offense. (*Id*. at pp. 555, 560-561; see also *People* v. *Croy* (1985) 41 Cal.3d 1, 11-12 [221 Cal.Rptr. 592, 710 P.2d 392].)

The majority conclude that it is inconceivable that a jury could have found that defendant did an act which aided the intentional killing of a witness, with knowledge of the perpetrator's purpose, without sharing the perpetrator's intent to kill. "Because of the manner in which defendant defended the case—denial that he in any way aided in the killing—there is no way for the jury to find that he 'aided' the killing only 'accidentally' or 'unintentionally.' [Citation.]" (Maj. opn. at p. 790.)

Actually, the jury need never have considered whether defendant did an act which aided the intentional killing of a witness, with knowledge of the perpetrator's purpose. A jury is not instructed to apply the aiding and abetting instructions separately to each charged act. On the contrary, the aiding and abetting instruction is given but once, and it informs the jury that the defendant who is liable as an accomplice is vicariously liable for the natural and probable consequences of his confederate's criminal acts. Thus the jury in this case was instructed: "One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged." The jury need only have found defendant liable as an aider and abettor in the robberies of the victims; the felony-murder verdict[1] and the findings on the felony-murder special circumstances and witness-killing special circumstance could follow without reconsideration of whether defendant did any further act which aided, or had knowledge of the perpetrator's further purpose to kill the victim.

Moreover, even a proper aiding and abetting instruction would not have assured us that the jury found that defendant, as an accomplice, shared the

[1] As in any first degree felony-murder case, the jury was instructed that a defendant is guilty of first degree murder for any homicide which results from an enumerated felony, whether the killing was intentional or accidental. (See CALJIC No. 8.21.) It was further instructed that all those involved in a conspiracy to commit a robbery are jointly liable for any killing in the course of the felony, so long as the killing is committed in furtherance of the felony. (See CALJIC No. 8.26.)

perpetrator's intent to kill a witness. Accomplice liability depends upon a general criminal intent, not upon shared intent to commit the target offense. We made this point in *People* v. *Croy, supra*: "[A] defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. His knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably forseeable offense committed as a consequence by the perpetrator. It is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense, which *Beeman* [(1984) 35 Cal.3d 547] holds must be found by the jury. [Citation.]" (41 Cal.3d at p. 12, fn. 5.)

I cannot say with certainty that because the verdicts establish that defendant must have done an act which aided a robbery, with knowledge of the perpetrator's purpose, that it is established that defendant shared the perpetrator's intent to kill. It should be remembered that the jury was unable to reach a verdict on the allegations that defendant personally used a weapon in committing each offense. This indicates that the jurors were not able to agree on whether defendant, or his accomplice Roelle, was the actual killer. They could have decided that Roelle was the killer, and defendant an accomplice. Such a theory would condemn defendant for the felony murders, without ever requiring consideration of whether defendant shared Roelle's intent to kill. Defendant's complete denial does not change the fact that the jury may never have considered whether he had the intent to kill the victims. Under this state of facts, I cannot agree that it was harmless beyond a reasonable doubt to fail to instruct the jury of the intent to kill requirement for accomplice liability in the felony-murder special-circumstances allegations.

Mosk, J., concurred.

Petitions of both parties for a rehearing were denied March 30, 1989. Broussard, J., was of the opinion that appellant's petition should be granted.