*1009 KENNARD, J., Concurring and Dissenting.
Although I join the majority in affirming the judgment of death, I disagree with the majority’s analysis of two of defendant’s claims.
Defendant contends that the prosecutor improperly exercised peremptory challenges against certain prospective jurors on the basis of their race. (See Batson v. Kentucky (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (Batson); People v. Wheeler (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (Wheeler).) The majority rejects that contention. So do I, but for reasons different from the majority’s, as explained later.
Defendant also challenges the sufficiency of the evidence supporting the jury’s special circumstance finding that he killed a witness to prevent her from testifying against him. Unlike the majority, I agree with defendant that the evidence was insufficient, and I would therefore vacate this particular special circumstance finding. This conclusion does not, however, compel reversal of the judgment of death: Two other special circumstances are valid, so that defendant was eligible for the death penalty. Furthermore, the invalid special circumstance did not prejudice defendant at the penalty phase, because the jury could properly consider, as circumstances of the crime (Pen. Code, § 190.3, factor (a)), all of the evidence pertaining to the invalid witness-killing special circumstance.
I
Defendant was charged with murdering his girlfriend’s cousin, 14-year-old Billie-Jo Laurie Farkas and with kidnapping, robbing, and attempting to murder Farkas’s best friend, 15-year-old Angie Higgins. Farkas was White, as is Higgins. Defendant is Black.
The jury venire had a total of seven Black prospective jurors. After two of those jurors were excused for cause, the prosecutor used peremptory challenges to excuse four of the remaining five prospective Black jurors.[1]
After the prosecutor challenged the third Black prospective juror, defendant made a motion for a mistrial, arguing that the challenges were racially based. Defendant renewed the motion after the prosecutor challenged the fourth Black prospective juror. In each instance, the trial court found the motion meritless because the defense had not made a prima facie showing that the prospective jurors were excused because of their race. In each instance, the *1010 trial court asked the prosecutor to explain the reasons for the challenges. After hearing the prosecutor’s reasons (see pp. 1011-1013, post), the court reiterated its denial of defendant’s motion for a mistrial.
The federal and state Constitutions both prohibit a party from exercising peremptory challenges against prospective jurors on the basis of race. To determine the merits of a defendant’s claim that the prosecutor’s peremptory challenges were impermissibly based on race, the United States Supreme Court has set forth a three-step process: “First, the defendant must make out a prima facie case ‘by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.’ [Citation.] Second, once the defendant has made out a prima facie case, the ‘burden shifts to the State to explain adequately the racial exclusion’ by offering permissible race-neutral justifications for the strikes. [Citations.] Third, ‘[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.’ [Citation.]” (Johnson v. California (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410], fn. omitted (Johnson).)
Applying that test, the majority here states that defendant failed to satisfy the first requirement of making a prima facie showing that the prosecutor’s challenges were impermissibly based on race. I disagree, for two reasons.
First, as discussed in my dissenting opinion in People v. Boyette (2002) 29 Cal.4th 381 [127 Cal.Rptr.2d 544, 58 P.3d 391], and thereafter in my concurring and dissenting opinion in People v. Howard (2008) 42 Cal.4th 1000 [71 Cal.Rptr.3d 264, 175 P.3d 13], when, as here, the prosecutor has given reasons for the peremptory challenges, and the trial court has implicitly ruled on the ultimate question of whether the prosecutor acted with discriminatory intent, the preliminary inquiry as to whether the defendant made a prima facie case that the challenges were impermissibly based on group bias “ ‘becomes moot.’ ” (Boyette, supra, 29 Cal.4th at p. 469 (dis. opn. of Kennard, J.), quoting Hernandez v. New York (1991) 500 U.S. 352, 359 [114 L.Ed.2d 395, 111 S.Ct. 1859] (plur. opn. of Kennedy, J.); see also People v. Thomas (2011) 51 Cal.4th 449, 474 [121 Cal.Rptr.3d 521, 247 P.3d 886]; People v. Mills (2010) 48 Cal.4th 158, 174 [106 Cal.Rptr.3d 153, 226 P.3d 276]; People v. Lenix (2008) 44 Cal.4th 602, 613, fn. 8 [80 Cal.Rptr.3d 98, 187 P.3d 946]; but see People v. Taylor (2010) 48 Cal.4th 574, 612-613 [108 Cal.Rptr.3d 87, 229 P.3d 12].) What remains to be decided is only whether the prosecutor has offered “permissible race-neutral justifications for the strikes.” (Johnson, supra, 545 U.S. at p. 168.) That is what the majority here should have done, instead of focusing on whether the defense made a prima facie showing that the prosecutor’s challenges were based on purposeful racial discrimination; that question, as I just explained, had in this case become moot.
*1011 Second, even if the prima facie showing of group bias, which needs to be made under Wheeler, supra, 22 Cal.3d at page 280, and Batson, supra, 476 U.S. at pages 93-94, were not moot here, the record contains “evidence sufficient to permit the trial judge to draw an inference” (Johnson, supra, 545 U.S. at p. 170) that the prosecutor’s peremptory challenges were on their face impermissibly based on group bias.
In Wheeler, this court described how the prima facie showing can be made: “We shall not attempt a compendium of all the ways in which a party may seek to make such a showing. For illustration, however, we mention certain types of evidence that will be relevant for this purpose. Thus the party may show that his opponent has struck most or all of the members of the identified group from the venire .... He may also demonstrate that the jurors in question share only this one characteristic—their membership in the group— and that in all other respects they are as heterogeneous as the community as a whole. . . . Lastly, ... the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court’s attention.” (Wheeler, supra, 22 Cal.3d at pp. 280-281, fn. omitted.)
Each of those three types of evidence mentioned in Wheeler is present here. First, the prosecutor struck “most or all of the members of the identified group from the venire” (Wheeler, supra, 22 Cal.3d at p. 280) when he challenged four of the five prospective Black jurors who remained after two had been excused for cause. Second, the four challenged jurors shared only one characteristic, that of their race, and otherwise were “as heterogeneous as the community as a whole” (ibid..)-. One was an administrative law judge; another was a glass packager; a third was an office assistant for an insurance company; and the fourth worked as a truckdriver, a sales representative, and a pastoral counselor. Third, defendant was “a member of the excluded group” (id. at p. 281) and the victims appear to have been members of “the group to which the majority of the remaining jurors belong” (ibid.).[2]
Of those three types of evidence, none might by itself have been prima facie evidence of racial group bias in the prosecutor’s peremptory challenges. But the presence of all three, as occurred here, in my view “ ‘gives rise to an inference of discriminatory purpose.’ ” (Johnson, supra, 545 U.S. at p. 168.) Thus, unlike the majority, I conclude that defendant did make a prima facie *1012 showing, the first requirement of the three-step inquiry set forth by the high court in Johnson (see p. 1010, ante). But the prosecutor satisfied Johnson’s second step when he gave “permissible race-neutral justifications for the strikes.” (Johnson, at p. 168.) Remaining is Johnson’s step three, examining the prosecutor’s reasons for peremptorily challenging the four Black prospective jurors to determine whether the trial court properly found that the defense had not “ ‘proved purposeful racial discrimination.’ ” (Ibid.) As explained below, substantial evidence supports that finding by the trial court.
The prosecutor gave two reasons for peremptorily challenging Prospective Juror J.J.: (1) At an earlier stage in her life, JJ. was against the death penalty (at the time of trial, however, JJ. said she no longer opposed the death penalty); and (2) because JJ. was an administrative law judge, the prosecutor feared that she would “control the deliberative process.” These reasons are plausible and I see no reason to second-guess them. Although defendant points out that the prosecutor did not peremptorily challenge Juror C.S., a law school graduate, C.S., unlike J.J., did not serve in a judicial capacity and had not opposed the death penalty at an earlier stage in life.
With respect to Prospective Juror S.B., the prosecutor peremptorily challenged her because she wrote in the jury questionnaire that a killer had to have “something wrong ... in their mind because you don’t just go out and kill someone.” The prosecutor explained his concern that S.B. would give undue weight to psychiatric testimony for the defense. Defendant acknowledges that this explanation was race neutral on its face, but he asserts that the explanation was pretextual, noting the prosecutor’s failure to peremptorily challenge Prospective Juror J.P., who commented in the jury questionnaire that some criminals were mentally ill. Unlike S.B., however, J.P. did not express a belief that a killer must have psychological problems. Because this was a murder trial, it was reasonable for the prosecutor to regard Prospective Juror S.B. as being potentially more sympathetic to the defense than J.P.
As to Prospective Juror A.M., the prosecutor’s peremptory challenge was based on his unfavorable impression of AJM.’s demeanor and on A.M.’s view that, as the prosecutor characterized it, “jurors could be hoodwinked by the advocates in the case.” The prosecutor’s first reason, although vague, is a permissible race-neutral ground for challenging a prospective juror (see People v. Fuentes (1991) 54 Cal.3d 707, 715 [286 Cal.Rptr. 792, 818 P.2d 75] [prospective juror’s “body language” is a permissible basis for a challenge]), particularly when, as here, defense counsel did not dispute the prosecutor’s description of A.M.’s demeanor. Also race neutral is the prosecutor’s second reason for challenging A.M. (see generally People v. Cornwell (2005) 37 Cal.4th 50, 70 [33 Cal.Rptr.3d 1, 117 P.3d 622] [prospective juror’s “distrust of the criminal justice system” is a permissible basis for a challenge]). The *1013 record supports this explanation: A.M. said in his questionnaire that he had no objection to the death penalty so long as there was no “corruption,” and when asked by the prosecutor to elaborate on this, he expressed concern that jurors could be “manipulated . . . into giving the desired decision ... for the death penalty or for life in prison." Although several other prospective jurors who were not challenged by the prosecutor also expressed a distrust of lawyers, they did not link that distrust to their views on capital punishment; moreover, unlike those jurors, the prosecutor’s unfavorable impression of A.M.’s demeanor apparently increased his concern that A.M. might view the prosecution as “hoodwinking” the jury at trial.
With regard to Prospective Juror T.C., the prosecutor challenged him because he had “specific training and experience in issues that bear on this case,” because he had “minister[ed] to . . . people in the jail” and was “involved in . . . social programs,” and because the trial might interfere with T.C.’s “opportunity for promotional advancement.” In his jury questionnaire, T.C. mentioned that he was a licensed pastoral counselor; on voir dire he testified that he had a master’s degree in “Christian psychology,” and that he counseled drug addicts and child abusers. He also said that at work he had been chosen for promotion to a “management position,” but that he was required to take 15 weeks of out-of-town training, which was scheduled to begin shortly. Defendant acknowledges that the prosecutor’s explanation for challenging T.C. “appears on its face to be race-neutral.” But defendant points out that the prosecutor did not excuse other prospective jurors who had taken psychology courses or had conflicts with employment, and therefore, defendant argues, the prosecutor’s reasons were pretextual. I disagree: None of the unchallenged prospective jurors defendant mentions presented the combination of concerns that the prosecutor expressed about T.C.
When, as here, the trial court has ruled that the prosecutor’s race-neutral reasons for challenging a prospective juror are genuine and not pretextual, that finding will be upheld on appeal if supported by substantial evidence. (People v. Lenix, supra, 44 Cal.4th at p. 627.) Here, as I have explained, substantial evidence supports the trial court’s acceptance of the prosecutor’s race-neutral reasons for his peremptory challenges of Prospective Jurors J.J., A.M., S.B., and T.C.
I now turn to the second and final issue (the witness-killing special circumstance) in this separate opinion.
*1014 II
The jury found true three special circumstance allegations—murder during a robbery (Pen. Code, § 190.2, subd. (a)(17)(A)),[3] murder in the commission of attempted rape (id., subd. (a)(17)(C)), and murder to prevent the victim from testifying in a criminal proceeding (id., subd. (a)(10)). On appeal, this court’s majority rejects defendant’s challenges to the sufficiency of the evidence on each of those three findings. (Maj. opn., ante, at pp. 942-954.) I agree with that conclusion with respect to the special circumstance findings of murder during a robbery and murder in the commission of attempted rape, but not with respect to the witness-killing special circumstance.
A.
The pertinent facts are these:
Although murder victim Parkas was only 14 years old, defendant had expressed a sexual interest in her, saying on one occasion, “I know she wants me.”
On the evening of the murder, after learning that Parkas and 15-year-old Angie Higgins had gone to a movie theater in Fresno, defendant met the two young girls there and offered them a ride in his car. They went to a deserted park outside Fresno. Defendant went into the men’s restroom, then yelled for toilet paper. After Parkas brought him some paper towels, Higgins heard Parkas screaming at defendant to “stop.” Higgins went into the restroom and saw Parkas lying motionless and apparently unconscious on the concrete floor, her head between defendant’s knees. The floor was strewn with personal items belonging to Parkas. When Higgins grabbed Parkas’s legs and tried to pull her away from defendant, defendant knocked Higgins down and began choking her. He then left the restroom. On his return defendant hugged Parkas (who had regained consciousness) and said he was sorry. He again left the restroom and returned with a rope, which he then used to tie Higgins’s hands behind her back. He left to get more rope, with which he tied Higgins to a toilet. He then told Parkas to come with him. Higgins heard screams, the sound of scuffling, then silence.
Defendant came back into the restroom, saying Parkas had run away. He then put Higgins in the car and drove around for hours, eventually stopping in a rural part of southwest Fresno at 3:00 a.m. He told Higgins to walk to the trunk of the car, after which he approached her from behind and strangled her into unconsciousness. When another car approached, he fled.
*1015 Parkas’s body was found early the next morning. A rope was around her neck; her blouse was pulled up, her bra was above her breasts, and her pockets were empty. She had been strangled. She also had four broken ribs and she had head injuries that could have been caused by being struck with a blunt object or being slammed against a concrete floor.
B.
A defendant convicted of first degree murder can be sentenced either to death or to life imprisonment without the possibility of parole if the jury finds true a special circumstance allegation that “[t]he victim was a witness to a crime who was intentionally killed for the purpose of preventing his or her testimony in any criminal . . . proceeding, and the killing was not committed during the commission ... of the crime to which he or she was a witness ....’’ (§ 190.2, subd. (a)(10).) This special circumstance has three elements: “(1) a victim who has witnessed a crime prior to, and separate from, the killing; (2) the killing was intentional; and (3) the purpose of the killing was to prevent the victim from testifying about the crime he or she had witnessed.” (People v. Garrison (1989) 47 Cal.3d 746, 792 [254 Cal.Rptr. 257, 765 P.2d 419].)
In this case, I question the adequacy of the prosecution’s evidence on the last of the three elements just described—that defendant killed Parkas to prevent her from testifying about seeing defendant tie Higgins to a toilet. As discussed in part II.A., ante, Higgins interrupted defendant’s brutal assault on Parkas in an attempt to rescue Parkas. After defendant subdued Higgins and tied her up, defendant resumed the assault on Parkas, culminating in her death. Under those circumstances, it is unlikely that defendant murdered Parkas because she witnessed his attack on Higgins. But I need not determine whether the prosecution presented sufficient evidence that defendant committed the murder for that purpose, because the evidence fails to satisfy the first element of the witness-killing special circumstance: that the victim must have “witnessed a crime prior to, and separate from, the killing.” (People v. Garrison, supra, 47 Cal.3d at p. 792, italics added.)
Here, defendant’s attack on murder victim Parkas’s friend Higgins began well after his brutal attack on Parkas, when Higgins, in response to Parkas’s screams, entered the restroom and tried to pull Parkas away from defendant. At that point, defendant knocked Higgins down to the floor and began choking her. After tying Higgins to a toilet, defendant took Parkas outside the restroom and resumed his attack on her, strangling her.
Although defendant briefly left Higgins and Parkas alone in the restroom three or four times after he began his assaults against them and before he *1016 killed Farkas, he did so only to obtain items that he used to facilitate the commission of, and to destroy the evidence of, his ongoing criminal activity: a flashlight that he used to check for evidence that could be used against him, a basin of water that he used to wash blood off of the restroom floor, and two ropes that he used to bind Higgins’s hands and to tie her to a toilet. No interruption occurred in defendant’s “common criminal intent” (People v. San Nicolas (2004) 34 Cal.4th 614, 655 [21 Cal.Rptr.3d 612, 101 P.3d 509]) towards Farkas and Higgins.'
Higgins was still tied to the toilet when defendant took Farkas, who by then had regained consciousness, outside the restroom and strangled her. Defendant’s tying up of Higgins was the only crime that Farkas witnessed. (Farkas was unconscious when defendant, before tying Higgins to the toilet, knocked her to the floor.) Hence, the crimes against Higgins were not “prior to, and separate from” (People v. Garrison, supra, 47 Cal.3d at p. 792) the assault that ended in Farkas’s death. Rather, the crimes defendant committed against Higgins and Farkas were a “continuous transaction.” (People v. Silva (1988) 45 Cal.3d 604, 631 [247 Cal.Rptr. 573, 754 P.2d 1070].)
Because the prosecution here presented no substantial evidence that the crime witnessed by Farkas was prior to and separate from the murder itself, I would reverse the witness-killing special circumstance. That conclusion, however, would not require reversing the judgment of death, as explained below.
C.
When, on appeal, the evidence is determined to be insufficient to support a special circumstance finding, the judgment of death need not be reversed if the defendant suffered no prejudice. Prejudice results if the special circumstance was necessary to make the defendant eligible for the death penalty. But even if another special circumstance made the defendant eligible for the death penalty, the defendant may still have suffered prejudice if the jury’s penalty verdict was influenced by evidence pertaining to the invalid special circumstance that was not otherwise admissible. (See Brown v. Sanders (2006) 546 U.S. 212, 220 [163 L.Ed.2d 723, 126 S.Ct. 884]; People v. Castaneda (2011) 51 Cal.4th 1292, 1354 [127 Cal.Rptr.3d 200, 254 P.3d 249].) Neither form of prejudice exists here.
Although, in my view, the evidence does not support the witness-killing special circumstance, two valid special circumstances remain: murder during a robbery and murder in the commission of a sexual assault. Thus, the invalid special circumstance was not essential to make defendant eligible for the death penalty. Nor did the existence of the invalid special circumstance affect *1017 the balance of aggravating and mitigating circumstances that the jury considered at the penalty phase. The evidence pertaining to the invalid witness-killing special circumstance—that is, the evidence that defendant killed Parkas after she saw defendant tie up Higgins—was properly considered by the jury as “circumstances of the crime.” (§ 190.3, factor (a).) Because the invalid witness-killing special circumstance did not prejudice defendant, I join the majority in affirming the judgment of death.

 The prosecutor did not challenge the fifth and last of those jurors, and she served as a juror for the guilt phase of trial; during the sanity phase, she asked the trial court to excuse her, citing stress at home and the need to find employment. The court granted her request, and she thus did not participate in the jury’s deliberations at the sanity and penalty phases of trial.

 Although the record does not state the race and ethnicity of the other prospective jurors, it is reasonable to infer that, at the time of the prosecutor’s peremptory challenges, a majority of the prospective jurors were White. Only two of the jurors who served on the guilt phase jury had Hispanic surnames; none had Asian surnames.

 All further statutory citations are to the Penal Code.