Filed 8/20/15  P. v. Harris CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RONALD HARRIS,<br><br>    Defendant and Appellant. | D068065<br><br><br><br>(Super. Ct. No. FSB1205607) |

APPEAL from a judgment of the Superior Court of San Bernardino, Lorenzo R. Balderrama, Judge.  Affirmed.

Richard Glen Boire, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., Randall Einhorn and Parag Agrawal, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Ronald Harris of simple assault, a misdemeanor, as a lesser included offense of assault with a deadly weapon. (Pen. Code, § 240.) Harris was granted probation on various terms and conditions which are not at issue here.

Harris appeals contending the trial court committed reversible error in replacing two sick jurors with alternates while Harris was absent, having failed to appear. Harris also contends the court erred in its instructions to the jury on Harris's defense that he was making a citizen's arrest at the time of his contact with the victim. Finally, he contends the court erred in admitting certain prosecution rebuttal evidence. We will find no error by the court with regard to any of Harris's contentions. Therefore we will also reject his claim of cumulative error.

## STATEMENT OF FACTS

Harris does not challenge the sufficiency of the evidence to support his conviction. His only evidentiary challenge is a claim the prosecution's rebuttal evidence was irrelevant. Accordingly we will set forth only a summary of the evidence produced at trial. We find the summary of facts in the respondent's brief to be accurate and we adopt it here for convenience.

On December 6, 2012, around noontime, Jesus Padilla was riding his motorcycle northbound on Mountain View Avenue toward the I-10 freeway in Loma Linda. Padilla was splitting lanes[1] as he drove down Mountain View while the other vehicles were stopped. As Padilla was approaching Business Center Drive, while splitting lanes on a

---

1      Splitting lanes means to ride between two lanes.

2

two-lane street, a car being driven by appellant moved to the middle of the lane to block Padilla from moving forward. Padilla stopped next to this car. The car was directly to Padilla's right.[2] Padilla raised his arms with his palms out, in order to communicate, "What are you doing?" Padilla did not hit or kick the car. After the light turned green, the car continued to block Padilla. Padilla moved behind the car and eventually, when the road split from two lanes to three lanes, Padilla attempted to pass on the right side of the car, travelling about 10 to·15 miles per hour. Appellant then drove directly toward Padilla, striking him and causing him to fly off the motorcycle.

Around the same time of the collision, Denise Cummings was also driving northbound on Mountain View. Cummings witnessed the collision. Before the collision, Cummings was driving behind appellant, and noticed a motorcycle riding in between lanes. The motorcycle was on her left side. Cummings moved her vehicle to the right to allow the motorcycle to pass; however, appellant swerved toward the motorcyclist and "continued to swerve at [the motorcyclist] multiple times." Cummings believed appellant was trying to hit the motorcyclist. The motorcyclist avoided appellant, slowed down, and then again attempted to pass. Appellant swerved toward the motorcyclist, preventing the motorcyclist from passing. Cummings saw the motorcyclist raise his hands indicating, "Hey, what are you doing?" Next, the motorcyclist slowed down, was positioned between appellant and Cummings's vehicle, and then tried to pass appellant on the right

---

[2] On cross-examination Padilla testified that he did not have any·contact with this car at Mountain View Avenue and Redlands Boulevard, which preceded Business Center Drive on Padilla's route.

side, travelling at approximately 10 to 15 miles per hour. During this attempt to pass, appellant again swerved toward the motorcyclist, and the motorcyclist hit the side of the car with his hand. Appellant made another swerving motion, this time more "extreme," and hit the motorcyclist. As a result, the motorcyclist flew off his motorcycle. Cummings stopped her vehicle, called 911, and checked to see if the motorcyclist was okay. Appellant was not concerned with the motorcyclist's well-being and was taking pictures of the scene.

Padilla was taken by ambulance to the emergency room. He suffered back, neck, and leg pain for a few months as a result of the collision. Additionally, Padilla's motorcycle was damaged. San Bernardino County Sheriff's Deputy Chris Hensman responded to the scene of the collision. Deputy Hensman saw a dark colored Saab with a motorcycle wedged underneath it. Deputy Hensman contacted appellant who was agitated, semi-angry, and excited. Hensman documented that appellant's passenger side mirror was broken.

Defense Case

Eleanor Borkowski was driving northbound on Tippecanoe Avenue·on December 6, 2012, when she saw a motorcyclist stop by the driver's side window of a stopped car in the lane next to her even though there was room for the motorcyclist to continue forward. The motorcyclist and driver exchanged words and, when traffic started to move, Borkowski honked her horn indicating to the motorcyclist to move in front of her. Instead of moving in front of Borkowski, the motorcyclist moved behind the car

4

with which he had an altercation. The motorcyclist approached the car on its right side and Borkowski heard a crash and saw the motorcycle go "down."

Appellant testified that he drives a blue 1999 Saab 95. On December 6, 2012, he was traveling north on Mountain View. He was stopped in traffic south of Redlands Boulevard and moved his car leftward within his lane to see what was causing the traffic. As he was looking out, he heard a loud noise coming from the driver's side window that scared him. He saw a motorcyclist at the window, and believed the motorcyclist struck the window with his left hand. The motorcyclist made a threatening gesture as if he wanted to fight appellant.

When traffic started to move, the motorcyclist rode by appellant and hit the driver's side mirror, causing it to go all the way forward and then snap back in place. After the incident, the driver's side mirror had three slight chips in the paint that appellant claimed were not present before. Appellant claimed that he reflexively swerved to the right and then back left to center himself. The motorcyclist rode away. Appellant testified he tried to get close to the motorcycle to get his license plate number. As appellant approached Business Center Drive, he could not see the motorcyclist, who had moved ahead of him. After Business Center Drive, as appellant was reaching the I-10 freeway, appellant saw the motorcyclist again. Appellant began to merge into the next lane with his turn signal activated and his car angled between the lanes because of the stopped traffic. He saw the motorcyclist positioned behind him, and the motorcyclist either blew his horn or made gestures. Appellant saw the motorcyclist with his hands up, palms in the air. Appellant believed Padilla was upset.

5

Appellant testified that the motorcyclist subsequently rode alongside the right (passenger) side of his vehicle, stopped, stood on one foot, and hit the mirror as hard as he could with his left hand, causing the mirror to break. Appellant reflexively moved his car in the direction of the curb, and the motorcyclist tried to accelerate through the gap between appellant's car and the curb. Appellant tried to close the gap to prevent the motorcyclist from fleeing. As the motorcyclist tried to accelerate away, appellant's right front fender crashed into rear tire of the motorcycle causing the motorcyclist to fall off the motorcycle. Appellant tried to straighten his car and realized the motorcycle was pinned under his car. After the collision, there was no damage to the side and rear of appellant's car, only the front of the car and side view mirror were damaged.

Appellant turned his car off, dialed 911, grabbed his camera, and started documenting the scene of the collision.

Rebuttal

Deputy Hensman spoke to appellant at the scene of the collision. Appellant told Hensman that the motorcyclist hit his mirror, he reacted, and his car and the motorcycle became entangled. Appellant said he hit the motorcycle because he wanted to prevent the motorcyclist from getting away.

Deputy Hensman testified that he is trained in use of force to effectuate an arrest. Hensman stated deputies are allowed to use the reasonable force necessary to make an arrest and that reasonableness is based on a reasonable deputy. Hensman testified that if someone who he was trying to arrest had a baseball bat, he could use a gun to make an arrest and that would be reasonable. Though Deputy Hensman is not trained in using the

6

precision immobilization technique ("PIT") maneuver, it can be used at speeds under 35 miles per hour. Hensman testified that one has to be certified to use the PIT maneuver and that the San Bernardino Sheriff's Office does not use the maneuver on motorcyclists because of the "inherent vulnerability of the motorcycle rider" and because it is considered "lethal force."[3] Lethal force is used in situations where there is a risk of a loss of life, and cannot be used to arrest someone for committing a misdemeanor. The policies regarding the implementation of the PIT maneuver vary from agency to agency.

DISCUSSION

I

*SUBSTITUTION OF ALTERNATE JURORS*

After the jury had deliberated for several days, the court learned that two of the jurors were ill. There were two alternate jurors remaining and the court excused the two sick jurors and replaced them with alternates. The jury was instructed to start over with its deliberations using CALCRIM No. 3575.

Harris did not show up in court as ordered in the morning session when the court excused the first juror without objection by defense counsel. The parties were to return at 1:30 p.m.

When court resumed, Harris was still absent. At that point the court learned it had to replace a second juror. The court proposed to replace the juror and read the appropriate instruction. At that point, with Harris still absent, defense counsel objected:

---

3    Deputy Hensman explained that lethal force is force that could result in the subject's death.

7

"We are losing two jurors. They (the jury) don't know why we are losing the jurors. They don't know they are sick today. They are going to know that two jurors are coming in, and they are not going to see Mr. Harris, and I don't want them to draw any conclusions that there was some contact between Mr. Harris and the jurors."

After defense counsel was unable to explain why Harris was absent or when he might arrive, the court told the jury that Harris was trying to get to court, but was having some problems. The court then said:

"Two of your fellow jurors have been excused and alternate jurors . . . had been selected to join the jury. Do not consider this substitution for any purpose. The alternate jurors must participate fully in the deliberations that lead to any verdict. [¶] The People and the defendant have the right to a verdict reached only after full participation of the jurors whose votes determine that verdict. The rights will only be assured if you begin your deliberations again from the beginning. Therefore, you must set aside and disregard all past deliberations and begin your deliberations all over again. Each of you must disregard the earlier deliberations and decide this case as if those earlier deliberations had not taken place. [¶] Now, please return to the jury room and start your deliberations from the beginning."

The court also explained to the jury that the missing jurors suffered health problems which caused their absence.

Harris contends his rights under the Fifth, Sixth and Fourteenth Amendments were violated when the jurors were replaced and instructed to start over in their deliberations when he was absent from court. Harris recognizes there was no testimony taken and no witnesses were called. He argues he was prejudiced because he was not able to "subject a psychological influence" on the jury.

We will find the Sixth Amendment inapplicable to this contention. As to his due process claims, we will find there was absolutely no prejudice to Harris by the

8

substitution of jurors and instructions to start over in deliberations while Harris was absent from court.

## A. Legal Principles

In *People v. Waidla* (2000) 22 Cal.4th 690, 741-742, the court discussed the rights of defendants to be present at the various stages of a criminal trial:

> "Under the Sixth Amendment's confrontation clause, a criminal defendant does not have a right to be personally present at a particular proceeding unless his appearance is necessary to prevent 'interference with [his] opportunity for effective cross-examination.' [Citation.] [¶] Similarly, under the Fourteenth Amendment's due process clause, a criminal defendant does not have a right to be personally present at a particular proceeding unless he finds himself at a 'stage . . . that is critical to [the] outcome' and 'his presence would contribute to the fairness of the procedure.' [Citation.] [¶] . . . [¶] Lastly, under sections 977 and 1043 of the Penal Code, a criminal defendant does not have a right to be personally present where he does not have such a right under section 15 of article I of the California Constitution."

In order to show prejudice from actions taken in a defendant's absence the person must demonstrate that his or her presence was required because it " 'bears a reasonable and substantial relation to his full opportunity to defend against the charges.' [Citation.] The defendant must show that any violation of this right resulted in prejudice or violated the defendant's right to a fair and impartial trial." (*People v. Hines* (1997) 15 Cal.4th 997, 1039.)

In order to prevail on a claim that his absence from the process of replacing two sick jurors violated his due process right, Harris must demonstrate his absence denied him a fair trial. (*People v. Garrison* (1989) 47 Cal.3d 746, 783.) Since the question of

9

constitutional violation in this case is not dependent on the sufficiency of the evidence, we review the issue de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1230.)

B. Analysis

We first observe that Harris was not excluded from the events surrounding the replacement of jurors. Harris repeatedly failed to appear during the deliberation period, however, we must still determine if there was an infringement on his fundamental rights.

We also observe there is no contention here that the jurors should not have been replaced. Likewise there can be no argument that the court was required to tell the reconstituted jury to start over with its deliberations. Thus there was nothing in the process subject to dispute nor was there anything that happened that would have made it important for Harris to be in court when the fairly ministerial actions took place.

When the first juror was replaced there was no defense objection. In the afternoon, when Harris again failed to appear as ordered, the defense objected. However the gravamen of the objection was that the jurors would not know why the others had been replaced and might assume Harris, who was absent, might have had contact with the excused jurors. However unmeritorious the stated objection was, the trial court took steps to prevent the alleged harm mentioned by counsel.

The court informed the jury that the missing jurors were ill and had to be excused. The court even went on to give a benign explanation for Harris's continued absence: car trouble. The proffered reasons for the objections were all addressed by the court. Thus we are left with the question of what possible prejudice to Harris was there by acting in his absence? The answer counsel provides is that Harris missed the opportunity to

10

"subject a 'psychological influence' on them." We recognize that the right of confrontation of witnesses contained in the Sixth Amendment, contemplates a defendant's physical presence during the taking of testimony, however, such right is not applicable to court proceedings that do not involve the evidentiary process. As we have pointed out the only constitutional argument available here would be based on prejudice rising to the level of a denial of due process. The argument presented here that Harris was going to subject the jurors at this point to "psychological influence" is bizarre.

There were no substantive instructions given to the jury. No jury questions were raised. The alternate jurors were present throughout the trial, argument and instructions. All that happened was that two sick jurors were replaced and the jury, as required, was told to start over again. We are at a loss as to how Harris, even if he decided to show up as ordered, would subject the jury to psychological pressure. The argument is inventive and the alleged "prejudice" is almost mystical. However, we are not persuaded by it. The record is devoid of any indication that Harris was prejudiced by the action taken in his absence.

II

*ALLEGED INSTRUCTIONAL ERROR*

Harris did not dispute that the encounter between himself and the victim took place. He did not dispute that the victim was knocked off of his motorcycle and injured and that Harris's car ran over the motorcycle. What Harris did contend was that he had been assaulted when the victim, trying to pass Harris the second time, struck the window of Harris's car and broke the passenger side mirror. Harris contends that he had a right to

11

make a citizen's arrest at that point and that cutting off a moving motorcycle with his car, hitting the motorcycle and knocking the rider off of the vehicle was an authorized, reasonable use of force. Harris contends the trial court erred in the instructions given by failing to define what constitutes "necessary and reasonable force." We will find no error in the court's instructions.

## A. Background

The trial court rejected a defense instruction on citizen's arrests. The court gave the following instruction instead:

> "The defendant is not guilty of assault with a deadly weapon or simple assault if he was making a lawful citizen's arrest. [¶] The defendant was making a lawful citizen arrest -- citizen's arrest if he -- using no more force than was necessary and reasonable, he acted because Jesus Padilla committed or attempted to commit misdemeanor vandalism or misdemeanor assault in the defendant's presence. [¶] This defense is not available to a person who uses unreasonable or excessive force or deadly force. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant was not making a lawful citizen's arrest. [¶] If the People have not met this burden, you must find the·defendant not guilty of assault with a deadly weapon or simple assault."

The principal dispute over the jury instruction deals with the permissible force available to a person making a citizen's arrest for a misdemeanor. The question relates to whether using his car to stop the victim from riding away amounted to excessive force. If so, the defense of citizen's arrest would not be available.

The main difference between the instruction offered by Harris and that used by the court is that the proposed defense instruction stated when the arrestee flees:

> "In that event, the person effecting the arrest may use such force as is reasonably necessary to accomplish the arrest and detention and to

12

defend himself. [¶] The person making an arrest is acting lawfully if force or means used are such as would be considered necessary by the ordinarily reasonable person placed in the same position and if from the standpoint of such a reasonable person force and means used was apparently necessary."

It was defense counsel's position with the jury that a civilian making an arrest had more latitude in deciding what force to use than would a police officer. The reason for such conclusion was that officers are trained and citizens are not. Thus the untrained citizen should be able to use a degree of force which officers could not. Naturally, Harris offers no authority for such a novel position. As we will discuss below, the authority of law enforcement to make arrests is greater than the more limited power of the citizen. Thus we cannot understand why the citizen would be able to lawfully use more force than could be used by police.

## B. Legal Principles

The power of a citizen to arrest another person is contained in Penal Code section 837: "A private person may arrest another: 1. For a public offense committed or attempted in his presence. [¶] 2. When the person arrested has committed a felony, although not in his presence. [¶] 3. When a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it."

A person who makes a citizen's arrest may use reasonable force to detain the arrestee and the arrestee has a duty not to resist the use of reasonable force to effect the arrest. (*People v. Fosselman* (1983) 33 Cal.3d 572, 579.) Deadly force cannot be used in making a citizen's arrest for a misdemeanor offense. (*People v. Martin* (1985) 168 Cal.App.3d 1111, 1115-1116.) Even in the case of a citizen's arrest for the commission

13

of a felony, deadly force may not be used unless the felony threatens life or serious bodily injury. (*People v. Piorkowski* (1974) 41 Cal.App.3d 324, 329-330.)

The arrest powers of peace officers are contained in Penal Code section 836, et seq. For example, peace officers can arrest on probable cause and do not have to show a crime has in fact been committed, whereas the citizen's power only arises where a crime has in fact been committed.

Harris has cited no authority for the proposition that the standard for determining the lawful use of force by a citizen to arrest is the "reasonable person" standard. Our research has not revealed any such authority. It is clear the statute authorizing citizen's arrests for misdemeanor offense only allows the use of reasonable and necessary force against a fellow citizen.

## C. Analysis

The court's instruction in this case directed the jury to the proper standard for assessing the validity of the use of force by Harris. He could not use deadly force, or excessive force to arrest for the misdemeanor committed in his presence. The force not only had to be necessary but reasonable.

In this case, which looks like "road rage," Harris, perhaps unwittingly, cut off the victim who was lane splitting and attempting to pass Harris on the left. The victim, angered and frustrated, attempted to then pass Harris on the right and was again blocked. When the victim finally passed Harris on the right side, the victim used his fist to strike the passenger window and broke the passenger side mirror. In his alleged effort to apprehend the victim for misdemeanor assault and vandalism, Harris pulled in front of

14

the moving motorcycle causing the motorcycle to hit the car and propel the rider over the front causing him injury. The car then ran over the motorcycle.

Whether a "reasonable person" might have thought it appropriate to apprehend the victim by cutting off the moving vehicle (a concept we seriously doubt), a jury could reasonably conclude the force used posed a clear risk of great bodily injury, or even death. The instruction gave the jury the appropriate standard for assessing the defense. Thus there was no error.

III

*EVIDENTIARY ERROR*

After the defense case was concluded the prosecution offered testimony from a deputy sheriff regarding the propriety of using a car to cut off a "fleeing suspect." The term used for such process was the "PIT maneuver." The deputy explained police were restricted in using such maneuver because of the danger it presents. The testimony was that the Sheriff's Department in San Bernardino did not use the PIT maneuver, because it could result in fatal injury.

Harris objected to the testimony regarding law enforcement's limitations on the use of a moving car to cut off a moving motorcycle, contending the testimony was irrelevant. The trial court overruled the objection.

A. Legal Principles

When we review a trial court's decision to admit or exclude evidence, we apply the familiar abuse of discretion standard. Under that standard an appellant must clearly demonstrate the decision was so unreasonable as to be an abuse of the court's discretion.

15

(*People v. Lee* (2011) 51 Cal.4th 620, 643.)  Similarly where the court rules on opinion testimony we also apply the abuse of discretion standard.  (*People v. San Nicolas* (2004) 34 Cal.4th 614, 663.)

Evidence is relevant where it has a tendency in reason to prove or disprove a material fact in the action.  (Evid. Code, § 210; *People v. Cowan* (2010) 50 Cal.4th 401, 482-483.)  Opinions by lay persons are admissible where the person has sufficient knowledge of matters that would be within the person's ordinary experience as to be relevant to a disputed issue.

The trial court found the opinion testimony of the deputy was relevant to the question of what force would be reasonable in an effort to make an arrest for a misdemeanor involving moving vehicles on a roadway.  The court instructed the jury on the use of lay opinion:

> "Witnesses who were not testifying as experts gave their opinions during the trial.  You may but are not required to accept those opinions as true or correct.  You may give the opinions whatever weight you think appropriate.  Consider the extent of the witness's opportunity to perceive the matters on which his or her opinion is based, the reasons the witness gave for any opinion, and the facts or information on which the witness relied in forming that opinion.  You must decide whether information on which the witness relied was true and accurate.  You may disregard all or any part of an opinion that you find  unbelievable, unreasonable, or unsupported by the evidence."  (CALCRIM No. 333 (Opinion Testimony of Lay Witness.)

## B.  Analysis

Harris argues the testimony of what limitations a law enforcement officer may have on using force such as was used by Harris was irrelevant.  His claim in trial and here

16

is largely that evaluating the actions of a citizen is completely different than evaluating a law enforcement officer. He largely contends a citizen must have more "leeway" in deciding what force to use because they are not trained like law enforcement. In short that argument seems to say a citizen could use more force to effect a misdemeanor arrest than a law enforcement officer could in the same circumstances. We disagree.

The statute allowing citizens to arrest is more limited than that which allows peace officers to arrest. The authority of a citizen to use force on another citizen is limited by the requirement that it be both reasonable and necessary. The deputy's testimony advised the jurors of the risks of using a moving car to cut off and thus stop a moving motorcycle. We agree a jury could find that a citizen might have believed the force was necessary, but might have a reasonable doubt about reasonableness of the force. It could find some differences between what a peace officer would understand and what the citizen understood at the time. The instruction placed the burden of disproving a valid citizen's arrest on the prosecution.

While there are possible differences in the evaluation of the actions of police as opposed to that of a citizen, we cannot say the testimony of the deputy did not have a tendency in reason to prove or disprove the disputed issue of whether the force used was both necessary and reasonable. The trial court did not abuse its discretion in allowing the deputy's testimony.[4]

---

[4]    Since we have not discovered any error by the trial court, we find no basis for reversal based upon "cumulative error." Accordingly, we will not discuss this contention further.

17

DISPOSITION

The judgment is affirmed.


HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


McINTYRE, J.

18